UNITED STATES of America,
Plaintiff–Appellee,

v.

Deborah JOHNSON–DIX, Carlos Meyers, Darrell Walton, Carl A. Dawson, Jr., and Garrett Thompson, Defendants–Appellants.

Nos. 93–3292, 93–3469, 93–3524, 93–3736 and 93–3818.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 2, 1994.

Decided May 23, 1995.

Barry Rand Elden, Asst. U.S. Atty., Office of the U.S. Attorney, Crim. Receiving, Appellate Div., Chicago, IL, Vicki S. Marani (argued), Dept. of Justice, Crim. Div., Washington, DC, for U.S. in Nos. 93–3292, 93–3469, 93–3736 and 93–3818.

Scott J. Frankel (argued), Robert R. Cohen, Frankel & Cohen, Chicago, IL, for Deborah Johnson–Dix.

Irwin L. Frazin, Frazin & Fisher, James Childs, Jr., Childs, Willis & Associates, Chicago, IL, for Carlos Meyers.

Barry Rand Elden, Asst. U.S. Atty., Office of the U.S. Attorney, Crim. Receiving, Appellate Div., Chicago, IL, Vicki S. Marani (argued), Dept. of Justice, Crim. Div., Washington, DC, Joseph D. Heyd, Office of the U.S. Attorney, Chicago, IL, for U.S. in No. 93–3524.

Ellen R. Domph (argued), Chicago, IL, for Darrell Walton.

Jeffrey Urdangen (argued), Chicago, IL, for Carl Dawson.

Luis M. Galvan (argued), Office of the Federal Defender Program, Chicago, IL, for Garrett Thompson.

Before CUDAHY, EASTERBROOK and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.

This case is about a drug deal gone sour, leading to a shooting and then to an extortion attempt. Deborah Johnson–Dix, Carlos Meyers, Darrell Walton, and Garrett Thompson were charged with possession and with conspiracy to possess with the intent to distribute approximately one-half kilogram of cocaine. Johnson–Dix, Walton, Thompson, and Carl A. Dawson, Jr., were charged with various extortion offenses, and Johnson–Dix, Thompson, and Dawson faced additional charges related to their use of firearms in the course of the attempted extortion. Johnson–Dix pled guilty to the conspiracy and gun charges, while the remaining defendants proceeded to trial, where they were convicted by a jury on all counts. In this appeal, Dawson and Walton challenge their convictions and sentences, while the remaining defendants raise issues related only to their sentences under the Sentencing Guidelines. For the reasons that follow, we affirm on all issues.

## I. BACKGROUND

The events giving rise to these convictions began simply enough in early December of 1992. Meyers and Mark Nunnally sold one-half ounce of cocaine to a woman named "Slick" in Gary, Indiana. They then returned to Gary to visit Slick and her daughters the following two days, and on the latter visit, Slick introduced Meyers and Nunnally to Walton, who is her son. Meyers, Nunnally, and Walton discussed a half-kilogram cocaine deal to be financed by Thompson, who Walton said was his partner. Before negotiating the deal with Thompson, however, Meyers checked with his cocaine source in Chicago, a man known as "Mellow D,"[1] and obtained a quote of $11,000 per half kilogram. Meyers and Nunnally then agreed to sell a half kilogram to Walton and Thompson for $12,500. The following day, Meyers and Nunnally returned to the house in Gary, and Thompson gave Meyers $12,500 in cash. Johnson–Dix was apparently the source for a portion of this money.

---

1. Mellow D's real name is Henry D. Williamson, and he testified for the government at trial.

Meyers then went to Chicago to meet with Mellow D, leaving Nunnally behind in Gary as "insurance" because Walton and Thompson had no prior experience with these sellers. Mellow D, however, was unable to come up with a half kilogram of cocaine at the quoted price on such short notice, and Meyers could not locate an alternative source. As a result, Meyers never gave the $12,500 to Mellow D, but instead, Meyers apparently lost the money while searching for a source. When he realized the money was missing, Meyers told Nunnally over the telephone that he had given the money to Mellow D but that Mellow D had disappeared without producing any cocaine.

On December 15, Thompson, Walton, and Nunnally met Meyers in Chicago at a day care center owned by Meyers' mother and grandmother. Meyers repeated his story about giving the money to Mellow D and explained that Mellow D now was not returning his telephone calls. The group drove to Mellow D's house in Meyers' rented automobile, but no one answered the door. Walton suggested that they "take the bitch," meaning Mellow D's girlfriend (who apparently was in the house), but Nunnally convinced Walton that their complaint was with Mellow D and that his girlfriend was not involved. The group then set out for Walton's residence in Gary, but on the way, they met Johnson–Dix and Dawson outside a restaurant. From there, they proceeded to Gary. Johnson–Dix rode with Thompson and Nunnally, Meyers rode with Walton, and Dawson drove Johnson–Dix's Cadillac, which had a license plate reading "D MONEY."

Meyers and Nunnally spent the night in Gary, and in order to buy time, they decided to tell Walton and Thompson that they intended to mortgage property they owned in Mississippi to repay the $12,500. Nunnally told Thompson about the property the following day and indicated that it was necessary to travel to Mississippi to obtain a mortgage. Thompson said that Walton would have to go

with them, and he later ordered Johnson–Dix to go along as well. Thompson set the following Tuesday as the deadline for repayment of the money and made it clear to Meyers and Nunnally that if the deadline was not met, he, Walton, and Johnson–Dix would "have to do what they have to do."

On the evening of December 17, 1992, Walton, Johnson–Dix, Nunnally, Meyers, Dawson, and Larry Powell [2] gathered at Walton's residence in Gary. As the group was standing beside the white Buick Meyers had rented for the trip, Walton became angry about something, pulled a .45 caliber semi-automatic weapon from his belt, pointed it at the Buick's tires, and threatened to shoot. Johnson–Dix eventually calmed Walton, and sometime after midnight, the group (minus Dawson) set out for Mississippi.[3] They arrived in Jackson, Mississippi at about noon on December 18, and Meyers rented two motel rooms under a fictitious name. Meyers, Nunnally, and Powell stayed in one room, and Johnson–Dix and Walton shared the other. Johnson–Dix kept a Tec–9 semi-automatic weapon on her bed, and Walton still had his .45 caliber semi-automatic weapon.

The group stayed in Jackson for two days, during which Meyers attempted to obtain money while the others visited Walton's relatives in Greenwood, Mississippi. Telephone records indicated that Thompson made numerous calls to the motel on December 19 and 20, and Dawson also called the motel on December 19. Thompson eventually became convinced that Meyers and Nunnally were conning him, and he and Walton thus told Johnson–Dix to kill Nunnally in order to frighten Meyers. The original orders were that Nunnally should be murdered in Mississippi, but Thompson and Walton abandoned that plan when they realized that the numerous telephone calls between Gary and Jackson would implicate them. Their substitute plan was to have Johnson–Dix kill Nunnally during the return trip to Chicago.

---

2. Powell was Meyers' cousin, and he was going to Mississippi with the intention of visiting relatives. By all accounts, Powell was not involved in the failed drug deal and was unaware of the real purpose for the Mississippi trip.

3. Before leaving, Meyers hid a duffle bag filled with police gear in the Buick's trunk. Meyers and Nunnally planned to use the gear in Mississippi to impersonate police officers in order to obtain money or cocaine from drug dealers.

On Sunday December 20, the group checked out of the motel and headed to Greenwood, where they again stopped at the home of Walton's grandmother. Walton called Thompson one last time, and Thompson emphasized to Meyers that he needed his money back by Tuesday "or else."

Powell drove most of the way back to Chicago; Meyers was in the passenger seat, while Johnson–Dix, Nunnally, and Walton were in back. When Walton was sleeping, Johnson–Dix disclosed to Nunnally that she had been ordered to kill him, but she told Nunnally she would not do it because Nunnally had once been a fellow El Rukn gang member. Johnson–Dix explained her plan and indicated that when she told Nunnally to get out of the car, he should not hesitate, or Walton might shoot him.

At approximately 4:00 a.m. on December 21, Powell was dropped off at his home in Riverdale, Illinois, and Walton began driving the Buick. He drove to a dark road near an industrial area in Dalton, Illinois, where Johnson–Dix said she needed to get something out of the trunk. When Walton stopped the car, Johnson–Dix pointed to the door, indicating that Nunnally should get out. By the time Nunnally had walked to the rear of the car, Johnson–Dix had the trunk open and had pulled out the Tec 9. She told Nunnally to run, but before he got very far, Johnson–Dix shot him in the left calf, fracturing his fibula. Nunnally fell to the ground as Johnson–Dix fired a number of additional shots. She then pulled a second gun from the trunk, cocked it, and began walking toward Nunnally. She then turned abruptly, jumped into the Buick, and drove off with Walton and Meyers. When the Buick was out of sight, Nunnally pulled himself up and began running to a nearby factory. There, he saw the Buick pass slowly by the spot where he had been shot. A factory security guard eventually called an ambulance for Nunnally, and he was transported to a nearby hospital, where he spent just over two days receiving treatment on his leg.

At approximately 7:30 a.m. on December 21, Patricia Meyers received a collect telephone call from her son Carlos. He asked for a $12,500 loan to repay money that his friend Mellow D had taken from some other people. Carlos would not identify the people who were owed the money, but told his mother that he was their only connection to Mellow D. As a result, the others were holding him until the debt was paid. Patricia asked to speak with one of them, and Thompson came on the line. Thompson told Patricia that he had no intention of harming Carlos but that he needed to get his money back. He said he would call Patricia back at 3:00 that afternoon.

Patricia then called a number of friends and family members, one of whom involved the FBI and the Drug Enforcement Administration ("DEA"). FBI agents arrived at Patricia's apartment shortly thereafter and prepared to record any subsequent calls. Powell also called to tell Patricia that Nunnally had been shot by the people Carlos had been with over the weekend. Patricia called the hospital, and Nunnally begged her to loan Carlos the money so that he would not be shot as well. A series of telephone calls ensued between Carlos, his mother, and at times Thompson.

Finally, at 11:00 p.m., FBI agents observed Johnson–Dix, Meyers, Dawson, Walton, and Thompson standing near a Cadillac and a white Buick at an Amoco gas station not far from Patricia's apartment. At 11:55, Carlos called his mother from the station's pay phone, and Patricia told him that she had the money. Relaying instructions from Thompson, Carlos told his mother to put the money in the garbage can near pump number eight at the Amoco station. Once the money was in the garbage can, Carlos said he would be released. The group at the Amoco station then dispersed.

Federal agents converged on the station shortly afterward. They found the rented white Buick across the street, and they arrested Walton, who was seated inside. The agents seized a blackjack [4] from the passen-

4. A blackjack is a leather stick filled with metal. It is used by police officers (and unfortunately others) like a billy club.

ger seat and a Chicago Police Department hat from the rear window. In the trunk they found a loaded Intertec .22 caliber semi-automatic weapon, a duffle bag filled with police gear, and a knife.

As Walton was being arrested, another agent spotted the Cadillac with the "D MONEY" license plate driving slowly past Patricia Meyers' apartment. The agent pulled his unmarked car to the side of the road to allow the Cadillac to pass. As it did, the agent observed that Johnson–Dix was driving the vehicle and that Dawson was in the passenger seat. Dawson stared intently at the agent as the Cadillac crept by. Johnson–Dix then pulled the Cadillac to the side of the road in front of the agent's car, and Dawson turned in his seat to keep the agent in his view. Because the agent's car now was hemmed in by the Cadillac and the cars parked behind, the agent felt like a "sitting duck" and thus grabbed his shotgun and left the car, announcing that he was with the FBI. The agent saw Dawson point a metallic object in his direction, and he therefore fired at the Cadillac's trunk. As the Cadillac sped away, the agent fired a second shot, shattering the rear window. A five-to-six mile chase ensued before agents were able to stop the Cadillac. After arresting Johnson–Dix and Dawson, the agents found four operable firearms in the vehicle. First, a Taurus 9 mm weapon belonging to Dawson was cocked and loaded on the front passenger-side floor, below where Dawson had been seated when the agent fired on the Cadillac. Next to the Taurus, the agents found a Colt .45 semi-automatic weapon, which also was loaded. Between the cushions of the front seat was a loaded Smith & Wesson .357 Magnum, and on the floor behind the driver's seat was a loaded Intertec 9 mm semi-automatic weapon.

The agents arrested Dawson and then advised him of his *Miranda* rights. Dawson waived his rights and agreed to answer the agents' questions. Dawson told the agents that the Cadillac belonged to a woman named "D" (Johnson–Dix), that he had borrowed the vehicle from her, and that he had picked her up earlier that evening before proceeding to a bar in Gary, where they had met three

other people. Dawson had watched a football game at the bar and had paid little attention to the others. Johnson–Dix then had asked Dawson whether he would ride to Chicago with her "just for the fun of it." At that point, the agents accused Dawson of lying, and Dawson altered his story, telling the agents that one of the others had offered him $100 to ride to Chicago with Johnson–Dix. Dawson had been told it would be his job to catch a bag of money that would be tossed into the car. Dawson purported to know nothing else about the trip to Chicago, although he admitted that he had been recruited to go because of his size and intimidating appearance—Dawson is 6′5″ tall and weighs 270 pounds. Dawson told the agents that he and Johnson–Dix had stopped at an Amoco station, that they subsequently had noticed a car following them, and that they had pulled to the side of the road, where the man in the other car had proceeded to shoot at them. Dawson had no idea why the man had either followed or shot at them. Dawson also admitted to the agents that the Taurus 9 mm weapon found on the front floor of the Cadillac belonged to him, but he purported to use the gun only for protection while walking his dog in Gary.

As Walton, Johnson–Dix, and Dawson were being arrested, Thompson and Meyers fled the scene. Meyers eventually surrendered, and Thompson was apprehended a week later.

## II. DISCUSSION

### A. Trial Issues

#### 1. Carl A. Dawson, Jr.

Dawson raises a number of challenges to his convictions, three of which we discuss below. First, he argues that the evidence is insufficient to support the jury's verdict on the extortion and firearm charges. Alternatively, he asks for a new trial, claiming unfair prejudice from the testimony of an FBI agent to the effect that Dawson had not been truthful in making a statement immediately after his arrest. Finally, Dawson insists that the prosecutor's comments in rebuttal closing argument deprived him of a fair trial.

**1302**

a.

Dawson necessarily bears a heavy burden in asserting that the evidence was insufficient to support his convictions. In considering such a claim, "we review the record in the light most favorable to the government, and determine whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Theodosopoulos,* 48 F.3d 1438, 1449 (7th Cir.1995) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in *Jackson*)). We will reverse Dawson's convictions only if the record is devoid of evidence from which the jury could reach a finding of guilt. *Theodosopoulos,* 48 F.3d at 1449; *United States v. Rosalez–Cortez,* 19 F.3d 1210, 1215 (7th Cir.1994).

■■■ The crux of the challenge to the extortion convictions is that there is no proof that Dawson knew of the extortion conspiracy and that he intended to join it. Because agreements to engage in criminal activity are at the heart of conspiracy law (*United States v. Lechuga,* 994 F.2d 346, 348 (7th Cir.) (en banc), *cert. denied,* —— U.S. ——, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993)), a defendant's agreement to join the illegal objectives of a conspiracy must be supported by substantial evidence. *United States v. James,* 40 F.3d 850, 865 (7th Cir.1994), *cert. denied,* —— U.S. ——, ——, 115 S.Ct. 948, 1160, 130 L.Ed.2d 891, 1116 (1995); *United States v. Carson,* 9 F.3d 576, 587 (7th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994). Although it generally is insufficient to show that an individual was merely present when the details of a conspiracy were discussed, or when acts in furtherance of the conspiracy were committed, a defendant's "presence, along with other evidence indicating that the presence or act was intended to advance the ends of the conspiracy," is sufficient to establish the participatory link. *Theodosopoulos,* 48 F.3d at 1450; *see also Carson,* 9 F.3d at 587. And as we have said on numerous occasions, a defendant's participation in a conspiracy may be established solely by circumstantial evidence. *See, e.g., Theodosopoulos,* 48 F.3d at 1450; *United*

*States v. Townsend,* 924 F.2d 1385, 1390 (7th Cir.1991).

■■■ When Dawson's argument is considered in light of these standards, it is clear that the government produced substantial evidence showing that Dawson knew of the extortion conspiracy and agreed to join its illegal objectives. Although Dawson did not accompany the group to Mississippi and was thus not present either when Johnson–Dix shot Nunnally or when Meyers first called his mother, Dawson was present at and played a key role in some of the central acts in furtherance of the extortion conspiracy. For example, he agreed to accompany Johnson–Dix to Chicago in return for $100, knowing that he would be responsible for catching a bag of money that would be tossed into the Cadillac. Dawson also knew that he had been recruited to accompany Johnson–Dix because of his size and intimidating presence. Moreover, Dawson was present at the Amoco station when Meyers called his mother and learned that she had obtained the $12,500. He also was in the Cadillac with Johnson–Dix when Agent Becknell spotted the vehicle in the vicinity of Patricia Meyers' apartment. It was Dawson who stared intently at the agent as the Cadillac passed the agent's unmarked car, and it was Dawson who appeared to point a metallic object in the agent's direction, prompting the agent to fire. When agents finally were able to stop the Cadillac, they found Johnson–Dix, Dawson, and four loaded firearms inside. Dawson subsequently admitted that one of the weapons, which had been cocked and loaded, belonged to him.

Dawson contends in the face of this evidence that he had no knowledge of the extortion scheme and that Johnson–Dix simply put him in the wrong place at the wrong time. The jury, however, was free to reject that explanation and to conclude from the evidence that Dawson knew of the conspiracy and had agreed to further its objectives. Dawson's challenge to the sufficiency of the evidence essentially would require us to reject the jury's credibility assessments and to reweigh the evidence in his favor. This we cannot do. *See Carson,* 9 F.3d at 587. Dawson's conspiracy and related extortion convic-

tions are thus supported by substantial evidence.

■ Dawson's challenge to his firearm conviction fares no better. The jury found Dawson guilty of using or carrying a firearm during and in relation to a crime of violence under 18 U.S.C. § 924(c)(1). Dawson does not contest that the extortion offenses were "crimes of violence" for purposes of section 924(c)(3). He contends instead that the Taurus handgun recovered from the Cadillac had no connection to the extortion scheme. Indeed, Dawson testified at trial that he only carried the weapon to protect himself when walking his dog through the streets of Gary. It was completely fortuitous, according to Dawson, that he had the loaded gun with him on the night in question. Dawson contends, therefore, that he did not use or carry the firearm "during and in relation to" the extortion offenses.

In *Smith v. United States,* ── U.S. ──, ──, 113 S.Ct. 2050, 2059, 124 L.Ed.2d 138 (1993), the Supreme Court explained that the phrase "in relation to" means, at a minimum, "that the firearm must have some purpose or effect with respect to the [crime of violence]; its presence or involvement cannot be the result of accident or coincidence." In the context of a conspiracy to commit extortion, the "during and in relation to" requirement is satisfied if the firearm is in the possession or control of the defendant "and its possession aids in the accomplishment of the conspiracy's objective." *James,* 40 F.3d at 861. Here, the evidence is certainly sufficient to prove that Dawson's possession of the Taurus handgun aided the attempted extortion. Agents found the cocked and loaded Taurus on the floor below where Dawson had been seated when the Cadillac passed the agent's unmarked car near Patricia Meyers' apartment. Moreover, the agent opened fire on the Cadillac only after he saw Dawson point a metallic object in his direction. A reasonable jury could find from this evidence that Dawson used or carried the Taurus during and in relation to the extortion conspiracy

and that its presence in the Cadillac was not solely the result of accident or coincidence.

b.

■ Dawson next maintains that he was deprived of a fair trial when an FBI agent testified on cross-examination that Dawson had been untruthful in providing a statement to the agents immediately after his arrest.[5] When Dawson's counsel asked the agent whether Dawson had expressed a willingness to answer the agent's questions, the agent responded: "Dawson was, in my opinion, telling half-truths the entire night that he was in there." (Tr. at 455.) Dawson's counsel immediately moved for a mistrial, but the court denied the motion, explaining that the agent's answer had been invited by counsel's question. We review the district court's decision on this evidentiary matter for an abuse of discretion. *United States v. Smith,* 26 F.3d 739, 751 (7th Cir.), *cert. denied,* ── U.S. ──, 115 S.Ct. 680, 130 L.Ed.2d 612 (1994).

We must consider the agent's statement in the context of the line of questioning counsel was pursuing at the time. Dawson's counsel was asking Agent Roberts about his written report, which outlined the substance of Dawson's statements after his arrest. Counsel was attempting to make the point that the agent's report was silent as to whether Dawson knew of the kidnapping and attempted extortion. Once counsel was able to establish that the agent would have included anything of testimonial significance in his written report, the following colloquy between counsel and the agent ensued:

> Q. You never even bothered to ask Carl if he knew anything about a kidnapping, did you?
>
> A. That question was asked.
>
> Q. What was his answer?
>
> A. There was no answer to that question. He remained quiet.

(Tr. at 455.) Counsel attempted to discredit this response by referring back to the agent's earlier testimony that Dawson indeed had

---

5. Dawson also argues that he was prejudiced during his own cross-examination when the government made certain inquiries that lacked a good faith factual basis. We have considered the three instances addressed by Dawson in his brief and have concluded that the government's cross-examination did not deprive Dawson of a fair trial.

waived his *Miranda* rights and expressed a willingness to answer the agent's questions:

> Q. In other words, you asked—didn't he willingly tell you, affirmatively tell you, he is willing to answer your questions?
>
> A. Mr. Dawson was, in my opinion, telling half-truths the entire night that he was in there.

(*Id.*) The district court then denied counsel's ensuing mistrial motion on the ground that the agent's response had been invited by the question:

> You asked him whether in effect [Dawson] was being cooperative. That question permitted that answer. You are trying to suggest through your question that he was cooperative and truthful, and the agent said [Dawson] was [not] telling the truth. So, there is no basis for a mistrial and you invited that answer.

(*Id.* at 456.)

The district court clearly did not abuse its discretion in allowing the agent's answer to stand, as we agree that the agent's answer was invited by counsel's question. It is in any event doubtful that the agent's statement had any effect on the jury's assessment of Dawson's credibility, as the agent already had testified on direct examination, without objection from Dawson's counsel, that he had told Dawson in the course of their discussions that Dawson was not being entirely truthful. (*See* Tr. at 456; *see also* Tr. at 461–63.) Dawson confirmed during his own testimony that the agent had made such a statement in the course of the post-arrest interrogation. (Tr. at 638.) The agent's statement thus did not deprive Dawson of a fair trial.

#### c.

Dawson's final challenge to his conviction is addressed to the prosecutor's rebuttal closing argument and also relates to the credibility of Agent Roberts. Dawson's counsel intimated in his closing argument that the agent had lied in testifying that Dawson remained silent when questioned about the kidnapping and attempted extortion. The Assistant United States Attorney then countered with the following rebuttal argument:

> But attacking a federal agent who is out there to protect individuals in society and claiming that they committed perjury on the stand, a federal offense for this one case to get this one defendant is ridiculous. They would risk their careers to get this one defendant and commit perjury on the stand.

(Tr. at 1370.) Dawson's counsel objected, contending that there was nothing to suggest that the agent would be risking his career by lying. The district court overruled the objection and allowed the argument to stand. Dawson now contends that the prosecutor's argument was improper and that it deprived him of a fair trial. Although we agree that the government's argument was improper, we find that it did not so infect Dawson's trial that it deprived him of due process.

■ Our cases set out a two-part test for assessing allegations of prosecutorial misconduct in closing argument. First, we consider the prosecutor's disputed remarks in isolation to determine whether they are improper. If they are, we then consider the remarks in the context of the entire record and assess whether they had the effect of denying the defendant a fair trial. *Smith,* 26 F.3d at 753; *United States v. Badger,* 983 F.2d 1443, 1450 (7th Cir.), *cert. denied,* —— U.S. ——, —— U.S. ——, 113 S.Ct. 2391, 114 S.Ct. 76, 124 L.Ed.2d 293, 126 L.Ed.2d 44 (1993). In that regard, we look to

> the nature and seriousness of the statement; whether the statement was invited by the conduct of defense counsel; whether the district court sufficiently instructed the jury to disregard such statements; whether the defense could counter the improper statement through rebuttal; and finally, whether the weight of the evidence was against the defendant.

*United States v. Severson,* 3 F.3d 1005, 1014 (7th Cir.1993); *see also Badger,* 983 F.2d at 1450.

■ When considered in isolation, the prosecutor's statement, which vouched for Agent Roberts' credibility and speculated that the agent would risk his career by testifying falsely, was certainly improper. *See Badger,* 983 F.2d at 1451 (improper for prosecutor to ask jury during rebuttal argument

whether agent would risk his job, reputation, pension, and criminal charges in making up false statements); *United States v. Swiatek,* 819 F.2d 721, 731 (7th Cir.) (clearly improper for prosecutor to argue that agent had no reason to lie and to risk his career and reputation), *cert. denied,* 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987). We therefore must consider the statement in the context of the entire record to determine whether it deprived Dawson of a fair trial. We note in that regard that Dawson's counsel had no opportunity to counter the statement, as it was made in the government's rebuttal argument, and that the district court overruled an objection to the remark and allowed it to stand. The government contends, nonetheless, that even if the remark was improper, it was invited by the closing argument of Dawson's counsel. The government also maintains that the comment was harmless in any event when considered against the weight of the other evidence implicating Dawson in the extortion conspiracy.

■■■ Under the "invited response" doctrine, if defense counsel strikes the first blow, we will not necessarily reverse a conviction if the prosecutor attempts to even the scales by making a reasonable but otherwise improper response. *See Severson,* 3 F.3d at 1014; *Badger,* 983 F.2d at 1452. This doctrine, however, does not give the government license to respond in kind to what it deems an improper argument by a defendant's counsel, for as the Supreme Court has made clear, "two improper arguments—two apparent wrongs—do not make for a right result." *United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). Instead, the issue on appeal is "whether the prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant." *Id.* at 12, 105 S.Ct. at 1045; *see also Smith,* 26 F.3d at 755. We do not believe the prosecutor's statement had that effect here.

■■■ First, we can agree that the prosecutor's remarks were invited. During his own argument, Dawson's counsel directly challenged Agent Roberts' credibility:

There were no questions in that sanitized statement prepared by the agent, and there were no notations of Carl's numerous denials that he testified to whenever they would ask him about extortion. Why do you think he left out the denials? I don't know why he left them out. But if you believe what he says, Carl stared [at] him blankly when he asked him about extortion or kidnapping rather than saying, "No, I didn't do it. I had nothing to do with it. I don't know anything about it."

Is that a fair process, ladies and gentlemen, to put that agent on the stand and expect us to believe that that's what the post arrest statement of Carl was really like?

(Tr. at 1289–90.) The prosecutor apparently found it necessary after this attack to bolster the agent's credibility, and he went so far as to suggest that the agent would have no motive to risk his career by lying in this single case. When those arguments are considered in light of the entire record, we do not believe that the prosecutor's improper remark deprived Dawson of a fair trial. *See Badger,* 983 F.2d at 1452; *Swiatek,* 819 F.2d at 731. The arguments we have highlighted essentially joined a central issue in Dawson's case—whether the jury should believe Agent Roberts or Dawson's own exculpatory testimony at trial? The jury apparently did not find Dawson to be a credible witness, but the weight of the evidence against him indicates that the jury's finding cannot be attributed solely to the prosecutor's improper remark during closing argument. It thus did not deprive Dawson of a fair trial.

*2. Darrell Walton*

a.

In challenging his narcotics and extortion convictions, Walton first argues that the government's evidence was insufficient to prove that he knew of and intended to join either conspiracy. Like Dawson, Walton bears a heavy burden in making such a claim, as we review the evidence in the light most favorable to the government to determine whether any rational trier of fact could find that Walton knew of the charged conspiracies and intended to join them. *See James,* 40 F.3d at 865.

Walton's sufficiency challenge has two recurring themes, yet each would require that we reject the jury's credibility determinations or draw inferences from the evidence that are adverse to the jury's verdict. Walton's first contention is that the government's case rested primarily on the testimony of Nunnally, a convicted felon and cooperating witness whose testimony was inherently unreliable. But in convicting Walton and the other defendants, the jury necessarily credited Nunnally's testimony—and despite the district court's admonition to consider that testimony "with caution and great care." (Tr. at 1393.) We will not second-guess the jury's credibility determinations in evaluating Walton's challenge to the sufficiency of the evidence. *See, e.g., Carson,* 9 F.3d at 587.

Walton's second theme is that he lacked the mental capacity to comprehend the events around him, meaning that he never understood or agreed to join the illegal objectives of his co-defendants. In that regard, Walton describes himself as merely the pawn of Thompson and Johnson–Dix. He maintains that those two never included him in the discussions that were central to the narcotics and extortion conspiracies. To support his mental deficiency claim, Walton points to evidence indicating that almost seven years earlier, he had received unusually low scores on standardized intelligence tests. Yet even if the jury had accepted that Walton had a severe learning disability, it still could find from the evidence at trial that Walton was keenly aware of the illegal objectives of the cocaine and extortion conspiracies and that he had voluntarily associated himself with those criminal activities.

With respect to the failed cocaine deal, the government's evidence indicated that Walton originally met with Nunnally and Meyers and discussed the purchase of a half-kilogram of cocaine. Walton indicated that Thompson, who he described as his "partner," might be willing to finance the deal, and it was Walton who then introduced Nunnally and Meyers to Thompson. Walton was present when Thompson gave Meyers the $12,500 in cash to pay for the cocaine, and indeed, this exchange occurred at the residence Walton shared with his mother. When Walton and Thompson learned that Mellow D had absconded with the money, they took Nunnally to Chicago to meet Meyers outside the day care center. When the group did not find Mellow D at home, it was Walton who proposed that they take their frustrations out on Mellow D's girlfriend. The group then went back to Walton's residence in Gary, where they continued to discuss the missing money. Once Nunnally and Meyers hatched their Mississippi real estate plan, Thompson agreed to the trip only if Walton accompanied them. And just before the group set out for Mississippi, Walton drew his .45 caliber semi-automatic weapon from his belt and threatened to shoot the tires of the rented automobile. In Jackson, Mississippi, Walton shared a room with Johnson–Dix, who pled guilty to her role in these conspiracies, and maintained frequent contact by telephone with Thompson. Nunnally indicated that both Johnson–Dix and Walton were armed. When it became evident that Meyers had no property in Mississippi, Walton and Thompson told Johnson–Dix to kill Nunnally during the return trip to Chicago. Walton also made one final telephone call to Thompson from his grandmother's home in Greenwood, Mississippi. Finally, it was Walton who drove the Buick to the Dalton, Illinois location where Johnson–Dix shot Nunnally, and he then circled back to confirm that Nunnally was dead.

Once the group returned to Gary, Walton remained directly involved in the attempt to recover the $12,500. He was with Thompson, Johnson–Dix, and Meyers at various times when telephone calls were placed to Patricia Meyers, including the final call from the Amoco station. When government agents converged on the Amoco station, they found Walton in the white Buick across the street, where he apparently was waiting for Patricia Meyers to deliver the money to one of the station's garbage cans. Walton had a blackjack at his side and other weapons in the trunk. This evidence was more than sufficient to show Walton's knowledge of and participation in both the cocaine and extortion conspiracies. His insufficiency claims must therefore fail.

**b.**

Walton next maintains that he was denied a fair trial when the district court admitted against his co-defendant Meyers evidence pursuant to Fed.R.Evid. 404(b) of an earlier half-ounce cocaine deal between Meyers, Nunnally, and Walton's mother, whose real name was Birdie Custcard but who was known to Meyers and Nunnally as "Slick." Although Walton had not been involved in this deal, he argues that the evidence had a prejudicial "spillover" effect because the jury naturally would infer from his mother's participation in the transaction that Walton himself was involved with drugs. He further argues that even if the Rule 404(b) evidence was properly admitted, the government violated the district court's *in limine* order which prohibited the parties from revealing that "Slick" was Walton's mother or that the half-ounce cocaine deal had occurred at the Gary residence she shares with Walton. We review the decisions of the district court on the government's Rule 404(b) evidence for an abuse of discretion. *United States v. Mounts,* 35 F.3d 1208, 1214 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1366, 131 L.Ed.2d 222 (1995).

After the government provided notice of its intention to introduce evidence of the earlier half-ounce cocaine deal, Walton moved *in limine* to preclude this evidence, contending that the jury would assume his involvement with drugs from the participation of his mother and the fact that the transaction had occurred at his residence. Alternatively, Walton asked that if the evidence was admitted, the district court should preclude the government from establishing that "Slick" was Walton's mother or that the transaction occurred at his residence. The district court decided to admit the evidence against Meyers under Rule 404(b), as the court found the evidence relevant to Meyers' intent in the later half-kilogram cocaine deal. The court also found that the evidence helped to establish the context of the relationship between Meyers and Nunnally. The court recognized, however, that evidence of the earlier deal could unduly prejudice Walton's defense, and as a result, the court precluded the government from showing that "Slick" was Walton's mother or that the transaction had occurred at his residence. Yet, on cross-examination, after Meyers had denied selling a half-ounce of cocaine to a woman named Slick at a house in Gary, Indiana in December 1992, the prosecutor asked whether Meyers had in any event met a woman named Slick at that house. The following exchange occurred:

[Meyers]. I met a woman named Miss Custcard.

Q. You didn't know her as Slick?

A. I heard people refer to her as—

[Walton's Counsel]: Judge, I object.

THE COURT: No. He may answer.

Q. Did you ever meet a woman you knew as Slick? That's my question, sir. Not what other name you might have known her by. Did you ever meet a woman named Slick out there?

A. As I stated, I did not meet her under that name, but I heard people refer to her as Slick.

Q. So, the woman named Slick, that wasn't made up, there was a woman named Slick out there, right?

A. There was a woman named Miss Custcard out there who was referred to as Slick.

(Tr. at 1053.)

It is apparent that the prosecutor's persistent questioning on this subject exceeded the bounds of the court's *in limine* ruling, as Meyers' statements made it plain to the jury that Slick and Custcard were one and the same person. Because Nunnally already had testified that he and Meyers first sold a half-ounce of cocaine to a woman named Slick in Gary, and phone records offered by the government showed that Walton lived with his mother, Birdie Custcard, in Gary, Meyers' statements effectively established that Walton's mother was involved in the earlier cocaine deal. Although the district court found prior to trial that the danger of unfair prejudice to Walton from evidence linking his mother to the first transaction outweighed its probative value under Fed.R.Evid. 403, the court denied Walton's objection to the testimony at trial. The court also later denied Walton's motion for a mistrial, explaining

that the relationship between Slick and Walton had been established in earlier testimony and that, in light of the defense that Thompson, Walton, Meyers, and Nunnally had only been discussing an entertainment venture rather than a cocaine deal, the evidence was relevant to show that on at least one occasion, Meyers and Nunnally had traveled to Gary to sell cocaine.

■■■■ Walton first argues that because the spillover prejudice from the Rule 404(b) evidence was so great, the district court should not have admitted the evidence at all. Neither he nor Meyers argue, however, that the evidence was not admissible under Rule 404(b) solely against Meyers. *See, e.g., United States v. Betts,* 16 F.3d 748, 756 (7th Cir.1994) (discussing requirements for admission of "other acts" evidence under Rule 404(b)). Even if Rule 404(b) evidence is properly admitted against one defendant in a joint trial, however, the district court must consider whether the evidence may have a "spillover" effect that could deprive the other defendants to whom the evidence does not apply of their right to a fair trial. *See, e.g., United States v. Briscoe,* 896 F.2d 1476, 1498 (7th Cir.), *cert. denied,* 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990); *United States v. Davis,* 838 F.2d 909, 916 (7th Cir. 1988). The district court here attempted to limit any prejudice to Walton, who by all accounts was not involved in the half-ounce cocaine deal, by precluding the government from showing that Slick was Walton's mother. Although there certainly was a risk that Slick would be identified as Walton's mother at some point in the trial, it was not an abuse of discretion for the district court to admit the Rule 404(b) evidence against Meyers and then to attempt to limit its prejudicial impact on Walton through its ruling *in limine.*

■■■■ Walton contends, however, that once Meyers made the connection for the jury between Slick and Custcard, the district court should have granted a mistrial. Its failure to do so, in Walton's view, denied him a fair trial. Although we agree with Walton that the relationship between Slick and Custcard had not been established through earlier testimony, we do not believe that the prejudice to Walton from exposing that rela-

tionship outweighed its probative value at that point in the trial. Both Walton and Meyers testified in their own defense that they had been discussing a legitimate business venture at Walton's residence in Gary, and they denied ever discussing a cocaine deal. The jury was therefore required to determine whether the group actually had been discussing an entertainment venture, as defendants claimed, or whether they instead had been laying the groundwork for a half-kilogram cocaine deal, as Nunnally testified. Evidence that Meyers and Nunnally had sold a half-ounce of cocaine to Custcard in the same residence only two days earlier was thus highly probative, particularly in connection with the evidence that Custcard had introduced Meyers and Nunnally to Walton on their third visit to her home. The district court said as much in denying a mistrial, as the court explained that the earlier cocaine deal had become even more relevant in light of the testimony that a legitimate business venture rather than a drug deal had been discussed. (Tr. at 1109.) *Cf. United States v. Shields,* 999 F.2d 1090, 1099–1100 (7th Cir.1993) (defendant judge not unduly prejudiced by Rule 404(b) evidence that his codefendant had earlier bribed another judge when both defendants were asserting that codefendant had never passed the bribe in this case on to the judge), *cert. denied,* —— U.S. ——, 114 S.Ct. 877, 127 L.Ed.2d 74 (1994).

■■■■ Insofar as the jury may have linked Walton to the earlier drug deal simply because of the involvement of his mother, the district court offered before trial to instruct the jury that the Rule 404(b) evidence could only be considered against Meyers, but Walton's counsel never requested such an instruction. (*See* Tr. at 87.) That kind of instruction would have minimized any spillover prejudice to Walton. *See Mounts,* 35 F.3d at 1215–16; *Betts,* 16 F.3d at 761; *Shields,* 999 F.2d at 1100; *Briscoe,* 896 F.2d at 1498. The jury was in any event instructed at the close of the case to consider the charges against each defendant separately in light of the evidence applicable to that defendant. (Tr. at 1392–93.) To the extent that a jury might be inclined to draw an adverse inference against one defendant from an ear-

lier drug deal in which he played no part, such an instruction is presumed to cure any potential for prejudice. *See Davis*, 838 F.2d at 917.[6] We therefore find no basis for overturning Walton's convictions.

### B. Sentencing Issues

The various defendants also raise a number of challenges to their sentences under the Sentencing Guidelines.

#### 1. Garrett Thompson

##### a.

■ Thompson first challenges the two-point enhancement to his base offense level under U.S.S.G. § 3B1.1(c) for his role as an "organizer, leader, manager, or supervisor" of criminal activity involving less than five individuals. The district court applied this enhancement only to Thompson's extortion conviction, as it found that Thompson and the others played equally culpable roles in the cocaine conspiracy. Thompson contends on appeal that he was merely a participant in the extortion scheme, and he points to Johnson–Dix as the group's true "ring leader." We review the district court's finding that an enhancement is warranted by a defendant's aggravated role in the offense for clear error. *United States v. Billops*, 43 F.3d 281, 287 (7th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1389, 131 L.Ed.2d 241 (1995).

■ The primary concern of section 3B1.1 is the imposition of a punishment commensurate with the defendant's "relative responsibility within a criminal organization." *United States v. Fones*, 51 F.3d 663, 665 (7th Cir.1995); *see also United States v. Skinner*, 986 F.2d 1091, 1097 (7th Cir.1993). In evaluating relative responsibility, we are to consider the following factors:

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, App.Note 4.[7] Although we have placed particular emphasis on whether the defendant exercised control over other participants in criminal activity (*Fones*, 51 F.3d at 666; *United States v. Brown*, 944 F.2d 1377, 1381 (7th Cir.1991)), our overall focus on "relative responsibility" means that no one factor is essential to application of this enhancement. *Fones*, 51 F.3d at 665–66; *Skinner*, 986 F.2d at 1099; *see also United States v. Bell*, 28 F.3d 615, 617 (7th Cir.1994). We have therefore affirmed enhancements under section 3B1.1(c) if the defendant " 'was a key figure who coordinated and organized the criminal activity' " even if he did not necessarily control another participant. *See Bell*, 28 F.3d at 618; *Skinner*, 986 F.2d at 1098–99; *United States v. Lewis*, 954 F.2d 1386, 1396 (7th Cir.1992).

■ In the instant case, the district court adopted the probation officer's recommendation that the enhancement be applied. The Presentence Report ("PSR") emphasized that Thompson had assumed the leadership role in seeking the return of the $12,500 once it had been lost. Thompson set the deadline for the return of the money, told Meyers and Nunnally that they would "have to do what they have to do" if the deadline was not met, approved the trip to Mississippi on the condition that Walton go along, ordered Johnson–Dix to accompany the group to Mississippi, stayed in constant telephone contact with

---

**6.** Any error from the violation of the district court's *in limine* ruling was in any event harmless. The government's case against Walton, as we detailed earlier, was quite compelling. It did not turn on whether Walton's mother had purchased a half-ounce of cocaine from Nunnally and Meyers on a prior occasion. We thus have no doubt that the jury would have convicted Walton even had it not known that Slick was Walton's mother. *See Betts*, 16 F.3d at 760–61; *United States v. Manganellis*, 864 F.2d 528, 539 (7th Cir.1988).

**7.** Although the application note explains that these factors are relevant to distinguish "a leadership and organizational role from one of mere management or supervision," we have relied upon the same factors in assessing whether an enhancement is appropriate under section 3B1.1(c). *Fones*, 51 F.3d at 665; *United States v. Young*, 34 F.3d 500, 507 (7th Cir.1994); *Skinner*, 986 F.2d at 1096.

Walton and Johnson–Dix in Mississippi, and ordered Johnson–Dix to kill Nunnally on the return trip to Chicago. Moreover, it appears that Thompson also coordinated the attempt to extort money from Patricia Meyers upon the group's return to Chicago. For example, Thompson came on the line when Patricia first asked to speak to one of the people holding her son. Thompson told Patricia that he did not intend to harm Carlos but that he needed to get his money back. Thompson spoke to Patricia again during at least one other call. Finally, Thompson told Johnson–Dix and Dawson to survey Patricia's apartment at the time she was expected to deliver the money to the Amoco station. These facts establish that Thompson not only coordinated the extortion scheme but that he also exercised some level of control over both Johnson–Dix and Walton. Even if Johnson–Dix believed she was free to make her own decisions, as Thompson argues, that does not necessarily impact the level of Thompson's responsibility under section 3B1.1(c), as it is clear that the enhancement may apply to more than one person in any criminal organization. *See Billops*, 43 F.3d at 287; U.S.S.G. § 3B1.1, App.Note 4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."). The district court's finding under section 3B1.1(c) was thus not clearly erroneous.

b.

■ Thompson also contends that the district court engaged in impermissible double counting when it applied a seven-level increase to his base offense level under sec-

tion 2B3.2(b)(3)(A)(i) for the discharge of a firearm during the extortion attempt, and a five-level increase under section 2E2.1(b)(1)(A) for the discharge of a firearm during the conspiracy to collect an extension of credit by extortionate means. He contends that the use of the firearm had already been accounted for when the court imposed a five year mandatory, consecutive sentence for his separate firearm conviction under 18 U.S.C. § 924(c)(1). *See United States v. Mrazek*, 998 F.2d 453, 454 (7th Cir.1993) (mandatory penalties under section 924(c)(1) must be imposed consecutively to any other term of imprisonment).

Yet Thompson's counsel conceded at his client's sentencing hearing that the probation officer's calculations were in accord with Application Note 2 to section 2K2.4.[8] Under that note, a separate firearm conviction generally would preclude an enhancement to the defendant's base offense level for the use of the same firearm in an underlying offense. *Mrazek*, 998 F.2d at 454. But the note also crafts an exception to that rule where the defendant's adjusted guideline range, which includes the mandatory sixty-month sentence under section 924(c)(1), is lower than the range that would obtain if the specific offense characteristic had been applied. In that case, the higher of the two ranges is utilized, but the sixty-month mandatory consecutive sentence under section 924(c)(1) is subtracted from the minimum and maximum of the range to prevent double-counting. U.S.S.G. § 2K2.4, App.Note 2; *see also United States v. Jones*, 32 F.3d 1512, 1518 (11th Cir.1994).

The probation officer determined that the exception applied to Thompson's case (*see*

---

**8.** At the time of Thompson's sentencing, the application note provided:

> Where a sentence under this section is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for the possession, use, or discharge of an explosive or firearm . . . is not to be applied in respect to the guideline for the underlying offense.
>
> *Provided,* that where the maximum of the guideline range from Chapter Five, Part A (Sentencing Table) determined by an offense level adjusted under the procedure described in the preceding paragraph, plus the term of imprisonment required under 18 U.S.C. § 924(c) or § 929(a), is less than the maximum

of the guideline range that would apply to the underlying offense absent such adjustment, the procedure described in the preceding paragraph does not apply. Instead, the guideline range applicable to the underlying offense absent such adjustment is to be used after subtracting the term of imprisonment imposed under 18 U.S.C. § 924(c) or § 929(a) from both the minimum and maximum of such range.

The second paragraph to the application note has since been amended to authorize an upward departure if the adjusted offense level calculated under the first paragraph is less than the level that would apply without the adjustment. *See* U.S.S.G.App. C, Amendment 489.

Presentence Report at 7–8, 11–12, 23–24), and counsel conceded at the sentencing hearing that the probation officer had arrived at the appropriate sentencing range. We agree that the exception applied and that there was no double-counting because the sixty-month sentence required under section 924(c)(1) was subtracted from the minimum and maximum of the higher, unadjusted range. *See Jones,* 32 F.3d at 1518. The district court imposed a sentence in the middle of that range, and Thompson has provided us with no reason to disturb it.

### 2. *Darrell Walton*

Walton raises a number of challenges to his 168–month sentence, only two of which require brief discussion here. Walton first contends that the district court should have adjusted his base offense level under section 3B1.2 to account for his mitigating role in these offenses. In finding that Walton was neither a minor nor minimal participant under that section, however, the district court explained that while Walton was not the leader of either the drug or the extortion conspiracies, "he was close to being a co-leader" along with Thompson. (Oct. 12, 1993 Tr. at 31.) We review the district court's finding that Walton was not a minor or minimal participant for clear error. *United States v. Maggi,* 44 F.3d 478, 482 (7th Cir.1995).

■ In challenging the district court's finding, Walton contends that he was the least culpable of all the conspirators (*see* U.S.S.G. § 3B1.2, App.Note 1 (minimal participant is "among the least culpable of those involved in the conduct of a group")), and to support that contention, he revives the argument that Thompson and Johnson–Dix were constantly giving him directions and taking advantage of his reduced mental capacity. The district court, however, did not clearly err in finding that Walton was not among the least culpable participants in this criminal activity. The evidence fully supports the court's finding that Walton was in all likelihood second in command behind Thompson in directing the affairs of or otherwise supervising this criminal enterprise. For that reason, the district court also did not clearly err in finding that Walton was not a minor par-

ticipant. *See* U.S.S.G. § 3B1.2, App.Note 3 (a minor participant is "less culpable than most other participants").

■ Walton also challenges the district court's refusal to depart downward from his Guidelines sentencing range under the policy statement in section 5K2.13, which provides:

> If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

The district court explained in refusing a departure that Walton's offense could not be characterized as non-violent, and in any event, the court did not consider Walton to be suffering from "significantly reduced mental capacity" under the policy statement. (Oct. 12, 1993 Tr. at 32.) It is clear from the transcript of the sentencing hearing that the district court was not inclined to depart on this basis, regardless of whether Walton's offenses were characterized as "violent" or "non-violent." The court's discretionary decision in that regard is not subject to review by this court. *See United States v. Gaines,* 7 F.3d 101, 105–06 (7th Cir.1993).

### 3. *Carlos Meyers*

■ The only issue raised in Meyers' appeal is that the district court erred by enhancing his base offense level two points for obstruction of justice under section 3C1.1. That section authorizes an enhancement "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. Application Note 3 lists, among other things, "committing, suborning, or attempting to suborn perjury" and "providing materially false information to a judge or magistrate" as examples of the types of conduct that will support an enhancement under this guideline. U.S.S.G. § 3C1.1, App.Note 3(b) & (f). The guideline thus applies to a defendant who

provides false testimony at his own trial "concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States v. Dunnigan,* —— U.S. ——, ——, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993); *see also United States v. Dillard,* 43 F.3d 299, 309 (7th Cir.1994). Under the Supreme Court's *Dunnigan* decision, "if a defendant objects to a sentence enhancement resulting from [his] trial testimony, [the] district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same." —— U.S. at ——, 113 S.Ct. at 1117. We review the district court's obstruction finding for clear error. *Mounts,* 35 F.3d at 1219.

Meyers was the last of the defendants to testify at trial, and he essentially corroborated Walton's story [9] that the group had been discussing a legitimate entertainment venture rather than a cocaine deal. In applying the obstruction enhancement, the district court made detailed findings to support its conclusion that Meyers' testimony had been willfully false:

> The pure fact of the matter is that [Meyers'] version contrasted substantially, if not almost in toto, with all of the other evidence in the case, including the objective evidence. And even as I listened to it, my own sense was that it was full of untruths. . . .
>
> [Meyers] not only exculpated himself, but he laid it all at the feet of [Johnson–Dix], took out every other defendant in the case. She pleaded guilty in this case. Even she admitted this was a drug deal gone sour. And the evidence was overwhelmingly so, that this is a drug deal gone sour. Nobody did business like this. . . .
>
> And I think in all objectivity, Mr. Meyers' story was a concocted, calculated set of falsehoods. . . . I don't think it was true and it's repeated in substantial measure in his version of the offense to the probation

officer. That is a very fanciful account of what happened in this case. It can't possibly bear the weight of truth, and it doesn't. So I am going to apply the obstruction enhancement.

(Sept. 29, 1994 Tr. at 7–8.) In light of the court's statements, Meyers' contentions that the district court's findings were too vague and that the court never addressed the specific acts of perjury ring hollow. The district court's findings were both sufficient to satisfy *Dunnigan* and were not clearly erroneous. *See, e.g., Dillard,* 43 F.3d at 309; *United States v. Sanchez,* 32 F.3d 1002, 1006 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 346, 130 L.Ed.2d 302 (1994).

### 4. *Deborah Johnson–Dix*

The sole issue in Johnson–Dix' appeal is whether Nunnally's gunshot wound constituted "serious bodily injury," or only "bodily injury," under the Guidelines. The guideline applicable to extortion requires a four-level enhancement if any victim sustained "serious bodily injury." U.S.S.G. § 2B3.2(b)(4)(B). That term is defined to include any "injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, App.Note 1(j). The district court found that the four-level enhancement applied here because the gunshot from Johnson–Dix' Tec 9, which broke Nunnally's fibula and left both entry and exit wounds, caused "extreme physical pain" and also impaired the function of a bodily member. (Sept. 14, 1993 Tr. at 10–11.) We review the district court's finding as to the seriousness of Nunnally's injuries for clear error. *United States v. Davis,* 19 F.3d 166, 171 (5th Cir.1994); *United States v. Slow Bear,* 943 F.2d 836, 838 (8th Cir.1991).

Johnson–Dix insists that the bullet from her gun caused only "bodily injury," as opposed to "serious bodily injury." [10] The Guidelines define "bodily injury" as "any significant injury"—that is, any "injury that is

---

9. Walton also received an obstruction enhancement under section 3C1.1.

10. If that were the case, Johnson–Dix' offense level would be enhanced two rather than four points under section 2B3.2(b)(4).

painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1, App.Note 1(b). Johnson–Dix maintains that this definition more accurately describes Nunnally's gun shot wound, as there is nothing to indicate that Nunnally's physical pain was "extreme," that the injury required surgery, or that it did not heal completely.

Our colleagues in the Fifth Circuit affirmed a finding of "serious bodily injury" where a gun shot wound was less severe than Nunnally's injury here. *See United States v. Moore*, 997 F.2d 30, 37 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 647, 126 L.Ed.2d 605 (1993). In that case, a police officer had been shot in the leg, causing entry and exit wounds but requiring neither surgery nor hospitalization other than emergency room treatment. Although the court suggested that a lower departure "may arguably have been more appropriate," it found no clear error in the district court's fact-based finding. *Id.*

In the instant case, the bullet fractured Nunnally's fibula in addition to causing entry and exit wounds. Nunnally was hospitalized for over two days and his lower leg was placed in a cast. The district court's characterization of the wound as "serious bodily injury" was not clearly erroneous. *See also United States v. Desormeaux*, 4 F.3d 628, 630 (8th Cir.1993) (lacerated kidney from stabbing is "serious bodily injury"); *United States v. Reese*, 2 F.3d 870, 897 (9th Cir.1993) (fractured elbow constitutes "serious bodily injury"), *cert. denied*, —— U.S. ——, 114 S.Ct. 928, 127 L.Ed.2d 220 (1994); *United States v. Corbin*, 972 F.2d 271, 272 (9th Cir. 1992) (head laceration requiring twenty-five sutures is "serious bodily injury"); *Slow Bear*, 943 F.2d at 838 (skull fracture requiring hospitalization is "serious bodily injury").

## III. CONCLUSION

For the foregoing reasons, the convictions of Dawson and Walton and the sentences of all defendants are

AFFIRMED.