UNITED STATES of America,
Plaintiff–Appellee,

v.

Emmett GRANADO, Jr., Defendant–
Appellant.

No. 94–3195.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1995.

Decided Dec. 22, 1995.

Patricia A. Tomaw (argued), Office of United States Attorney, Springfield, IL, for Plaintiff–Appellee.

David W. Andich (argued), Stephen G. Andich, Rock Island, IL, for Defendant–Appellant.

Before EASTERBROOK, RIPPLE, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Emmett Granado, Jr., pled guilty to a charge that he and co-defendant Keith Collier had attempted to possess, with the intent to distribute, more than 500 grams of cocaine and marijuana. On appeal, Granado challenges two aspects of his sentencing: a two-level enhancement to his offense level for playing an aggravating role in the offense, and the imposition of a $100,000 fine that the district court believed could be satisfied from real estate titled in the name of his putative common-law wife. We affirm.

## I.

Granado's arrest was the culmination of a "reverse sting" operation conducted by Kleberg County, Texas Deputy Sheriffs Jaime Garza and Juan Guzman. Garza and Guzman contacted Granado in the fall of 1993 identifying themselves as drug suppliers and friends of "Louie," one of Granado's associates.

After a series of telephone conversations, Garza and Guzman finally met with Granado on November 11 at a Hardee's Restaurant in Moline, Illinois. Granado's daughter, Martina, accompanied her father to the meeting but sat at a separate table in the restaurant, out of hearing range. Granado indicated he was prepared to make an initial purchase of two kilograms of cocaine and ultimately four kilograms per month, so long as it was supplied to him on credit. Granado also sought to purchase 100 pounds of marijuana for one of his sons to resell; Granado himself did not like to traffic in that particular drug due to its bulk. So that Garza and Guzman might maintain a lower profile while in Illinois, Granado suggested that they keep an extra car with Illinois plates and proof of insurance, and offered to provide these items. Granado also explained that he avoided banks and either gave the profits from his business to his children or invested the money in real estate, titling some 150 properties in the names of his "nine different women" and "thirty-three kids." Tr. Nov. 11, 1993 at 9–10. Thus his seventeen-year-old daughter held fifty houses in her name. *Id.* at 13.

On the following day, Garza and Guzman informed Granado that they could not complete the initial two-kilogram sale at that time, but they subsequently assured him that they could do so on their next trip to Illinois, after Thanksgiving. True to their promise, the deputies contacted Granado when they returned to Illinois on November 30 and arranged to meet him at the Moline Hardee's on the following day. Martina Granado once again accompanied her father to the meeting; but, at her father's direction, after unloading a briefcase and placing it in the trunk of his car, she waited inside the restaurant while Granado and the undercover deputies talked in the parking lot outside. Granado told

Garza and Guzman that an associate had enough money ($11,000) to purchase part of the cocaine; but Granado confessed to having the "willies" about transacting business with relative strangers. After trying unsuccessfully to re-arrange the logistics of the purchase, Granado finally agreed to pick up his associate and bring him to the Hardee's.

Granado and his daughter left and drove to his office, where Keith Collier was waiting per Granado's instruction. So far as Collier knew, Granado wanted to see him about an apartment that Collier had expressed an interest in renting; with that in mind, Collier had brought with him $800 for the first two months' rent and a partial deposit. When Granado arrived at the office, however, he told Collier that he needed a favor in exchange for which Collier could keep half of the rent money.

Collier then accompanied Granado and his daughter back to the Hardee's parking lot. While en route, and in the presence of his daughter, Granado recruited Collier to negotiate the purchase of a half-kilogram of cocaine for $11,000 and to make it appear as if Granado himself were not involved in the transaction. Granado assured Collier that Garza was "straight," but explained "I just don't want him [Garza] to think that it's for me. . . . When you talk to him, you've got to make it look good, make it look like I'm not involved." R. 49 at 51.

When they arrived at Hardee's, Granado introduced Collier to Garza and Guzman as a "good man" (Tr. Dec. 1, 1993 at 23–24) and then excused himself from the negotiations. Collier proceeded to discuss the eventual purchase of three kilograms every two weeks and the immediate purchase of one-half kilogram for $11,000. Collier explained that he did not have the cash with him at that time, indicating that Granado would be the go-between. Garza repeatedly insisted that they would have to see the "paper" before they handed over the cocaine. *Id.* at 26, 28.

Collier returned to Granado's car and drove back to Granado's office with Granado and his daughter. Granado asked if everything had gone well with the negotiation and Collier assured him that "[e]verything's straight." R. 49 at 60. When they reached the office, Martina left the car to retrieve the money. When she returned, Collier got into his van and followed Granado and his daughter back to Hardee's. Within a block or two of the restaurant, Collier parked his van and got back into Granado's car; at that time, Martina handed him a brown paper bag containing $11,000.

When they arrived back in the Hardee's parking lot, Garza got into the back seat of Granado's car and asked Collier to show him the purchase money. Granado and his daughter were both present. When Collier handed over the paper bag, Garza told Granado to back the car up toward the deputies' vehicle so that the drugs could be transferred into the trunk. Granado complied, and Martina proceeded to open the trunk of the car by depressing a button in the glove compartment. Once the cocaine was placed in the trunk, Granado, his daughter, and Collier were arrested.

## II.

### A. Organizer Enhancement

■ Section 3B1.1 of the Sentencing Guidelines calls for an enhancement in the defendant's base offense level when the defendant has played an aggravating role in the offense. Subsection (a) specifies a four-level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive"; while subsection (b) calls for a three-level increase "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." In contrast to those two subsections, which envision the involvement of five or more participants or "otherwise extensive" criminal activity, subsection (c)—which calls for a two-level increase "if the defendant was an organizer, leader, manager or supervisor in any activity other than described in (a) or (b)"—may apply so long as the criminal activity involves more than one participant and the defendant played a coordinating or organizing role. *See United States v. Johnson–Dix,* 54 F.3d 1295, 1309 (7th Cir.1995); *United States v. Michalek,* 54 F.3d 325, 333 (7th

Cir.1995); *United States v. Herrera,* 878 F.2d 997, 1002 (7th Cir.1989); U.S.S.G. § 3B1.1, comment. (n. 2) (1994).

■ The commentary defines a participant as any person who is criminally responsible for the commission of the offense, although he or she need not have been convicted. *Id.* (n. 1); *see Michalek,* 54 F.3d at 333–34. Factors bearing on whether the defendant played an aggravating role in the offense (i.e., was a leader, organizer, manager, or supervisor) include the exercise of decision-making authority, the character of his participation in the offense, the recruitment of accomplices, a claim to a larger share of the profits from the crime, the extent to which the defendant helped plan or organize the offense, the nature and scope of the criminal activity, and the degree of control and authority exercised over others. § 3B1.1, comment. (n. 4); *see, e.g., Johnson–Dix,* 54 F.3d at 1309 & n. 7.

> Although we have placed particular emphasis on whether the defendant exercised control over other participants in criminal activity, our overall focus on "relative responsibility" means that no one factor is essential to application of this enhancement. We have therefore affirmed enhancements under section 3B1.1(c) if the defendant " 'was a key figure who coordinated and organized the criminal activity,' " even if he did not necessarily control another participant.

*Id.* (citations omitted).

■ Whether the defendant played an aggravating role in the offense is a question of fact, and we will not disturb the district court's finding on appeal unless it is clearly erroneous. *United States v. Salinas,* 62 F.3d 855, 861 (7th Cir.1995).

> A finding of fact is clearly erroneous only if, after reviewing the entire evidence, we are left "with the definite and firm conviction that a mistake has been committed." ... "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous."

*Herrera,* 878 F.2d at 1000 (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)); *see also Salinas,* 62 F.3d at 861. We note that although Granado's guilt was adjudicated based on his guilty plea rather than a trial, a substantial evidentiary record bearing on the question of Granado's role in the offense was nonetheless amassed at sentencing. The district court heard testimony from Garza, Collier and Granado, each of whom spoke to Granado's level of involvement in the offense; the court also had before it transcripts of each of the key conversations between Granado and the deputies. Having reviewed this record, we find no clear error in the district court's determination that Granado played an aggravating role in the attempt to purchase cocaine from deputies Garza and Guzman.

The criminal activity at issue here without question involved more than one culpable participant. Collier, of course, played a key role in the transaction with the deputies, serving as a "front" who completed the negotiations for the purchase of the one-half kilogram of cocaine that Granado wanted and brought the money for that purchase to the final meeting with Garza and Guzman. Indeed, Granado does not dispute that Collier qualifies as a participant; his argument is simply that Collier was equally if not more culpable than Granado for the offense and thus was in no way led or directed by Granado for purposes of the enhancement, a matter we shall take up in a moment.

■ Martina Granado's involvement in the negotiations was also sufficiently extensive that the district court believed her to be a participant. She was present at each meeting that Granado had with the two deputies, typically not participating in the discussions but sitting nearby facing the others (on at least one occasion, with a cellular phone), appearing to agent Garza to be the typical "lookout." R. 49 at 14–15. When Garza telephoned Granado on one occasion to say that he and Guzman had become lost on their way to a meeting with Granado, it was Martina whom Granado offered to send to meet them and guide them to the meeting site. *Id.* at 13. She was present in Granado's automobile when Granado instructed Collier to negotiate the cocaine purchase on his behalf and when Collier later reported success

to Granado on the return trip to his office to collect the purchase money. *Id.* at 59. When they returned to the office, it was Martina who exited the car to get the money. *Id.* at 56, 59. Finally, Martina was present when Collier displayed the cash to Deputy Garza; she even opened the trunk at Granado's direction in order to facilitate transfer of the cocaine. *Id.* at 50. Granado, of course, insists that any involvement Martina may have had in the transaction was purely unwitting. Indeed, Granado told Garza on one occasion that so far as his daughter knew, the transaction they were negotiating involved real estate rather than drugs. *Id.* at 17. On another occasion, Granado commented to Garza that he tried to keep his family members out of his drug trafficking so as to preserve their innocence. Tr. Nov. 11, 1993 at 35. It is not implausible, we acknowledge, that Martina Granado may, in fact, have not been criminally culpable in the sense of lending purposeful assistance to the criminal enterprise. But the record also supports the inference that Martina's involvement was knowing and deliberate—we note in particular that Martina was present when Granado openly instructed Collier as to how Collier should negotiate the purchase of cocaine. *See* R. 49 at 59. Consequently, we cannot say that the district court's finding that she was a culpable participant was clearly erroneous.

The district court also found that Granado directed the efforts of both Collier and his daughter, and the evidence amply supports this finding as to the second prong of the aggravating role enhancement. Although Granado made some self-serving statements to Garza and Guzman to the effect that he was just a middleman acting on behalf of others (in this case, Collier) (*e.g.*, Tr. Dec. 1, 1993 at 3–4), his actions betray an organizing role in the cocaine transaction. It was, of course, Granado who first met with Garza and Guzman and conducted the initial negotiations with the deputies. Collier, as his own testimony reveals, became involved in the transaction solely at Granado's behest in exchange for a break on his rent and for the express purpose of making it seem as if Granado were, per his representation to the deputies, merely a middleman in the deal.

In fact, however, Granado directed Collier as to what to do and say, and ultimately it was Granado who supplied the $11,000 in cash to buy the cocaine. Against this backdrop, Granado's claim that Collier was an equally if not more culpable cohort rings hollow. For that matter, even if Collier did assume some responsibility for the details of the transaction, that does not detract from Granado's own organizing role for purposes of section 3B1.1(c). *Johnson–Dix,* 54 F.3d at 1310 (citing *United States v. Billops,* 43 F.3d 281, 287 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1389, 131 L.Ed.2d 241 (1995)). As to Martina, although there is little direct evidence in the record as to what direction Granado may have given his daughter, it is clear that she assumed no leadership role in the transaction; on the contrary, her apparent role as a lookout and woman Friday suggests that she, like Collier, acted at Granado's behest. Under the circumstances, the district court permissibly inferred that Granado directed her own efforts as well as Collier's.

Given the orchestrating role that may be discerned from Granado's own words and deeds, the district court's decision to enhance Granado's base offense level by two points was amply justified. There was no clear error.

**B. Imposition of Fine**

■ The district court ordered Granado to immediately pay a fine of $100,000 in view of his "significant interest" in various real estate holdings titled in the name of Darla Lopez, his putative common-law wife (Illinois does not in fact recognize common-law marriage). Granado objects to the fine, arguing principally that the court erred when, in evaluating his ability to pay a fine, it considered assets to which he does not hold title.

Section 5E1.2(a) of the Sentencing Guidelines provides that the district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." We admonished recently that "[t]his language is to be taken seriously":

[T]he judge *must* impose a fine, unless the defendant demonstrates that he cannot pay *anything,* either at sentencing or in the foreseeable future. *United States v. Ahmad,* 2 F.3d 245 (7th Cir.1993); *United States v. Turner,* 998 F.2d 534 (7th Cir. 1993); *United States v. Ferrin,* 994 F.2d 658, 665–66 (9th Cir.1993). Defendants bear a heavy burden, because almost everyone has or will acquire some assets. *United States v. Gomez,* 24 F.3d 924, 926–27 (7th Cir.) (emphasis in original), *cert. denied,* —— U.S. ——, 115 S.Ct. 280, 130 L.Ed.2d 196, and *cert. denied sub nom. Vela v. United States,* —— U.S. ——, 115 S.Ct. 281, 130 L.Ed.2d 198 (1994).

The probation officer prepared a presentence report noting that Granado was forty-seven years old, had five young children with Lopez and thirty-three in total, had been receiving disability benefits from the Social Security Administration for several years, had not completed high school, had not been formally employed since 1983, and shared a joint checking account with Lopez with a balance of only $145. However, the probation officer also noted that Granado had acknowledged buying and selling properties in the years since his formal employment ended and, in fact, had taught Lopez and his children how to do the same. He also had acknowledged helping his family and relatives manage their properties and collect rental income, although he denied owning any interest in such properties. *See* R. 50 at 23, 28. Yet, the probation officer noted, Granado had been recorded telling an undercover agent in October 1993 that he arranged two or three property closings a month, that he "flipped" his drug profits into real estate, and that he had some 150 properties titled in the names of his thirty-three children and nine different women. *See* Tr. Nov. 11, 1993

at 9–10. Consistent with that representation, IRS records revealed numerous properties titled in the name of Martina Granado, his eighteen-year-old daughter. The probation officer thus concluded that Granado had an interest in real estate that would enable him to pay a fine. Specifically, the probation officer listed as assets available to Granado some eleven properties in Moline, Illinois with a total value estimated by Darla Lopez to be $215,772.[1] Apparently most or all of these were rental properties, although some were not occupied at the time the presentence report was prepared. Lopez had indicated to the probation officer that the properties were then yielding $2,000 per month in income; fully occupied, they would produce $5,000 per month, by Lopez's estimate.

At sentencing, Granado's counsel urged the court not to impose a fine, arguing, among other things, that the only significant assets that the probation officer had attributed to Granado were held not in his name but Lopez's. Like the probation officer, however, the court was convinced that whatever the titles might reflect, Granado was the true owner of these properties:

> It's interesting to me that the pre-sentence report indicates, among other things, that you do not have a very high—you did not test as having a very high intelligence quotient. I'm not sure whether that test was accurate or not, but it's clear to me that you are a person who is extremely street wise and I believe the statements that you made on the transcripts, that you have been in this business and have rolled the profits over into real estate.

> I first came into contact with that question when we had the bond hearing in this case....[2] I was satisfied at the end of

---

1. Lopez originally estimated the properties to be worth $293,747, but later reduced her appraisal. At sentencing, Granado's counsel (who apparently helped Lopez provide the estimate, *see* R. 49 at 107) noted that the lower figure reflected the properties' value as assessed by the Rock Island County Treasurer and was "the most current information" available. Counsel suggested that even this figure overstated the properties' true worth, but he supplied the court with no alternative estimate. *Id.* at 107. We shall therefore assume that the figure of $215,772 is accurate.

2. [Footnote by this court] In advance of trial, the district court had heard Granado's request for release on bond pending appeal. At that time, Special Agent Ron Nimmer of the Internal Revenue Service, Criminal Investigation Division, informed the court that in the course of one of the tape-recorded conversations between Granado and the deputies, Granado had stated that based on his real estate holdings, he could raise $2 million in bond money before he had to use any of his own money. R. 50 at 32–33; *see* Tr. Nov. 11, 1993 at 26–27. Nimmer also reported that

that hearing, and I'm still satisfied, that these real estate holdings that are listed in the name of your common-law wife are really the fruits of your labor as much as hers and that you have been selling drugs and turning the profits into real estate.

R. 49 at 109.

■ Granado initially criticizes the district court for failing to make specific findings as to each of the factors listed in 18 U.S.C. § 3572(a) and Guidelines § 5E1.2(d): his ability to pay the fine, for example, the burden the fine places on him and his dependents, and so on. But this criticism is without merit. We do, of course, require the district court to consider the variety of factors identified in the statute and the guideline, " 'or at least the factors relevant to the particular case.' " *United States v. Young,* 66 F.3d 830, 838 (7th Cir.1995) (quoting *United States v. Morgano,* 39 F.3d 1358, 1372 (7th Cir.1994), *cert. denied sub nom. Palermo v. United States,* —— U.S. ——, 115 S.Ct. 2559, 132 L.Ed.2d 813 (1995)). We also require the court to render findings as to the factors bearing on the fine (*United States v. Vargas,* 16 F.3d 155, 159 (7th Cir.1994)), an obligation that in most instances may be satisfied by adopting the findings of the presentence report, provided that probation officer herself has sufficiently analyzed the pertinent factors (*Morgano,* 39 F.3d at 1372–73). In this case, the district court explicitly adopted the findings set forth in the presentence report (R. 49 at 109); in addition, its own comments as to Granado's ability to pay a fine (R. 49 at 109–10, 112) reflect its specific agreement with the probation officer's finding on this point. *Cf. Vargas,* 16 F.3d at 159 (noting district court's failure to specifically adopt findings of presentence report as to fine). The presentence report does not, it is true, purport to evaluate other factors that might be relevant to the propriety of a fine, in particular one that Granado emphasizes on appeal—the burden a fine poses to his fami-

ly. But the reason for that omission appears clear. The probation officer noted that Granado had not completed the financial statement given to him nearly three months earlier; consequently, the probation officer had no information as to the family's living expenses, the degree to which Lopez and the children depended on him for financial support, and the extent to which a fine would burden his family members. Despite the note in the presentence report about the missing financial information, the record reflects no attempt by Granado to provide that information either prior to or during the sentencing hearing. Instead, the sole issue raised at sentencing with respect to a fine was whether the real estate holdings listed in the report could be considered given that Granado himself did not hold title to them. And that, as we have noted, is the principal objection Granado has raised with respect to the fine on appeal. Under these circumstances, we cannot fault the district court for not considering in greater detail the ramifications of a fine. *See Young,* 66 F.3d at 839 (defendant who refuses to provide financial data to probation department fails to meet his burden of proof as to inability to pay fine).

■ As to Granado's principal contention—that the properties titled in Lopez's name should not be treated as financial resources available to him for purposes of the fine—we find it to be without merit as well. Granado's argument in this respect is cursory; he relies merely on the fact that the properties considered were not titled in his name. To the extent this amounts to a legal argument that property titled in someone else's name can never be considered to be among the defendant's financial resources, we reject it. Normally, we agree, assets that truly belong to someone else should not be considered in assessing the defendant's ability to pay a fine. *But see United States v. Fabregat,* 902 F.2d 331, 334 (5th Cir.1990)

---

Darla Lopez had indicated both at a previous detention hearing and in an interview with Nimmer that she owned a number of properties in the Moline area on a 50–50 basis with Granado. R. 50 at 33, 39.

Granado and Lopez also testified at the pretrial hearing. Granado indicated that Lopez held be-

tween 30 and 40 properties in her name. R. 50 at 22. Lopez herself put the total at 27. She claimed that she had been purchasing inexpensive properties for twelve years, since she was "a little kid possibly." *Id.* at 27.

(per curiam) (wealth of family members may be considered where family had repeatedly provided financial assistance to defendant). Ownership of property is not always a function of title, however. One way narcotics traffickers launder the proceeds of their illicit activities, for example, is to purchase assets in the names of ostensibly innocent individuals. *See, e.g., United States v. Herrero,* 893 F.2d 1512, 1542–43 (7th Cir.) (real estate attorney was merely "nominal" owner of forfeited property; true owner was head of cocaine ring), *cert. denied,* 496 U.S. 927, 110 S.Ct. 2623, 110 L.Ed.2d 644 (1990). Nothing in either the statute or the guideline precludes the court from considering such assets to be among the financial resources from which the defendant might satisfy a fine; indeed, we believe it would be contrary to the intent of Congress and the Sentencing Commission to exclude from consideration property that, although titled in another's name, in fact remains within the defendant's dominion and control. So long as the evidence is sufficient to establish the defendant's interest in the property, the district court may count it among the defendant's financial resources. And the evidence was sufficient to establish that link here. Granado's own statements to the undercover officer reveal a practice of funneling the profits from drug trafficking into properties nominally owned by Lopez and his children; and although Granado later denied having any interest in these properties, he did acknowledge an ongoing role in managing them and collecting the rental income. *See supra* at 1292. Indeed, beyond pointing to the name on the titles, Granado has pointed to no evidence undermining the district court's conclusion that he retained a concrete, if not formal, interest in the properties. We therefore discern no clear error in the district court's finding.

### III.

Finding no clear error in the imposition of a two-point organizer enhancement or the $100,000 fine, we AFFIRM the sentence imposed on Granado.