UNITED STATES of America,
Plaintiff–Appellee,

v.

Eugene GERSTEIN, Defendant–
Appellant.

No. 95–3056.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 18, 1996.

Decided Jan. 16, 1997.

Barry Rand Elden, Chief of Appeals, Stephen Anderson (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for plaintiff–appellee.

Jeffrey Schulman (argued), Wolin & Rosen, Chicago, IL, for defendant–appellant.

Before COFFEY, DIANE P. WOOD and EVANS, Circuit Judges.

COFFEY, Circuit Judge.

The Government charged Eugene Gerstein with one count of bank fraud, in violation of 18 U.S.C. § 1344, and one count of money

laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The information alleged that during 1989 and 1990, Gerstein, with the assistance of others, engaged in a fraudulent scheme to obtain lines of credit totalling approximately $5.2 million from the First Midwest Bank of Buffalo Grove, Illinois (the "Bank"). Pursuant to a written plea agreement, Gerstein entered a plea of guilty to each of the two counts set forth in the information. In August of 1995, the defendant was sentenced to 46 months in prison and three years of supervised release on each of the counts, with the sentences to run concurrently, and ordered to pay restitution in the amount of $15,000. In imposing sentence, the district court found that the defendant was an organizer or leader of criminal activity involving five or more participants, and applied a four-level enhancement to his offense level under § 3B1.1(a) of the Guidelines. Gerstein appeals his sentence, arguing that the enhancement of his sentence was unwarranted. We affirm.

## I. BACKGROUND

For many years, Eugene Gerstein was the president, owner, and operator of three businesses operating out of the same location at 4258 North Cicero Avenue in Chicago, Illinois: First Metropolitan Financial Corporation ("Financial"), an enterprise which provided financing for home remodeling projects, First Metropolitan Builders Company ("Builders"), which was in the business of building home improvements, and First Metropolitan Carpet Company ("Carpet"), which provided carpeting and carpeting installation services.

On August 23, 1989, Gerstein executed a loan and security agreement with the First Midwest Bank, and in turn provided Financial with a $4 million line of credit. The loan was secured by Financial's accounts receivable, which were assigned to the Bank and

held in its vault. These accounts receivable consisted of home re-modeling finance contracts and carpet installation finance contracts that had been assigned to Financial by Gerstein's other two businesses, Builders and Carpet respectively. Financial's loan agreement with the Bank allowed Financial to withdraw as much as 75% (later increased to 80%) of the total sum of the outstanding balances on the finance contracts pledged as collateral, up to a maximum of $4 million. The terms of the agreement required Financial to submit regular reports to the Bank concerning the status of each of the finance contracts pledged as collateral. This agreement was subsequently amended to increase the credit limit to $5.15 million. On August 23, 1989, Gerstein executed a separate loan and security agreement with the same bank which provided Builders with a $600,000 line of credit. This loan contained terms similar to those in the loan to Financial and was secured by the same collateral (i.e., the previously-filed accounts receivable).

As Gerstein admitted (plea agreement),[1] he obtained funds pursuant to the two loan agreements by fraudulently inflating the value of Financial's accounts receivable. He was able to manipulate this fraudulent scheme by creating fictitious finance contracts to serve as collateral for the loans and at the same time by filing false and misleading reports with the Bank concerning the genuine finance contracts that comprised the accounts receivable. Gerstein was assisted by five of his employees: Marianne Davis, Stuart Krizman, Jenny Slink, Geri Andrewzuski, and Nan Kluzendoff, whose roles will be discussed in greater detail.[2]

Initially, Gerstein directed these employees to replace a number of the genuine finance contracts held by the Bank with phony or fictitious contracts. The Bank permitted Gerstein's employees to enter its vault, where the records concerning the accounts

---

1. Gerstein's plea agreement reserves the right to challenge the sentencing enhancement at issue in this appeal, yet it also concedes that Gerstein engaged in bank fraud and that he "directed and controlled" the activities of "four loyal employees" as part of his scheme to defraud the Bank.

2. We note that these employees' names are not spelled consistently throughout the record (for example, "Krizman" is sometimes spelled "Kreisman"). At oral argument, counsel for the United States proposed that we adopt the spellings utilized by the appellant. Lacking definitive spellings, we adopt those spellings provided in the appellant's brief.

receivable (i.e., loan collateral) were stored, allegedly for the purpose of updating the records. Unbeknownst to the Bank, however, Gerstein's employees used these visits to substitute bogus finance contracts, which they created from time to time as the need arose, for the authentic contracts held by the Bank, thereby fraudulently inflating the value of the accounts receivable. As of November 1990, a majority of the finance contracts held by the Bank as collateral were phony.

In addition to physically replacing the original, true contracts with fabricated documents, Gerstein's scheme included misrepresenting the status of genuine finance contracts in reports that Gerstein was required to submit to the Bank. These fraudulent reports, prepared by Gerstein's employees acting under his direction and control, falsely represented that work on various contracts had been completed (when in fact it had not), and also reported, falsely, that canceled or delinquent (past due) customer accounts remained current in their payments. As a result of this deception, the Bank was led to believe that certain contracts remained valid as collateral, and it therefore overestimated the total value of the accounts receivable. Under the terms of the loan agreements, the greater the value of the accounts receivable held as collateral, the more money Gerstein was permitted to draw on the lines of credit.

During the course of this scheme of defrauding the Bank, Gerstein used a portion of the funds advanced to him by the Bank to make receivables payments to the Bank, further contributing to the false impression that the various finance contracts pledged as collateral were all genuine contracts that were being paid in a timely fashion.

As Gerstein's business fortunes declined between August of 1989 and November of 1990, he and his employees continued to engage in their fraudulent scheme with the Bank, in order that Gerstein might continue to draw on the lines of credit. In late 1990, with business continuing in a downward spi-

ral, Gerstein fell behind in his monthly bank payments, and the Bank hired an independent accountant to audit the collateral. The accountant discovered that many of the pledged finance contracts were bogus and reported his findings to the Bank. Further investigation by the Bank confirmed that 1200 of the 1600 finance contracts on file pledged as loan collateral were fraudulent. Financial and Builders filed for bankruptcy in February of 1991.[3] According to the defendant's Presentence Report, the net loss to the Bank, as a result of the fraudulent scheme, was approximately $4.5 million.

Federal authorities commenced an investigation of Gerstein, presumably because the Bank had alerted them to the defendant's fraudulent activities.[4] FBI Special Agent James Reilly investigated the bank fraud scheme for the Government, conducting interviews with two of Gerstein's employees, Marianne Davis and Stuart Krizman, in March and December of 1992 respectively. During this investigation (the precise time frame is not clear), a grand jury was convened and several of Gerstein's employees (including Geri Andrewzuski, Nan Kluzendoff, and Jenny Slink) were called as witnesses. Shortly thereafter, Gerstein agreed to cooperate with the Government and was interviewed by Agent Reilly in August 1993 and again in March 1994. After concluding each of his interviews, Reilly prepared detailed written summaries, which became a part of the record of his investigation. As recounted above, the Government and the defendant negotiated a plea agreement, under which Gerstein agreed to enter a plea of guilty to bank fraud and money-laundering, based upon an information issued by the U.S. Attorney's Office. At Gerstein's sentencing hearing, the Government called Agent Reilly as a witness and asked him to relate the content of his interviews with the defendant, and to describe his interviews with employees Davis and Krizman. Agent Reilly testified that Davis, Krizman, Slink, Andrewz-

---

**3.** The record does not indicate the type of bankruptcy proceeding or the outcome.

**4.** Although the record does not state whether the Bank was federally chartered or insured, we assume that the Bank was a "financial institu-

tion" as that term is used in 18 U.S.C. § 1344 and defined in 18 U.S.C. § 20. Consequently, federal authorities had jurisdiction over the investigation of Gerstein's bank fraud scheme.

uski, and Kluzendoff all took part in the defendant's fraudulent activity, under Gerstein's direction and control, and acted with full knowledge that they were participating in a scheme to defraud the Bank. Reilly's detailed written summaries of his investigative interviews were received into evidence at the sentencing hearing and corroborated his oral testimony. Through Agent Reilly's testimony (and his written summaries), the sentencing court learned the following about the respective roles of Gerstein's employees in the scheme to defraud the Bank:

### 1. Marianne Davis

Marianne Davis worked for Builders from June 1986 through September 1990. Her duties included approving and disapproving credit, posting payments to accounts, and monitoring the status of the firm's finance contracts. Gerstein told Reilly that Davis was the employee upon whom he most relied to perpetrate his bank fraud scheme. Davis herself admitted to Reilly that she (along with Andrewzuski, Kluzendoff, and Slink) "fabricated the necessary paperwork" under Gerstein's direction. In other words, working together, these employees prepared the fraudulent finance contracts and reports that served as the basis for the lines of credit extended by the Bank. Davis also related how she used a light-box[5] to assist her in forging signatures on these fraudulent documents. She further admitted that she helped to maintain a color-coded record-keeping system so that Gerstein and his employees could distinguish phony finance contracts (i.e., contracts which they had created for the purpose of deceiving the Bank) from legitimate ones. Davis frequently entered the Bank's vault for the purpose of replacing genuine contracts with fraudulent ones, and when talking to Reilly she specifically referred to wearing "coats with large pockets" and bringing a "large briefcase" on these occasions, to assist herself in smuggling documents in and out of the Bank.[6]

### 2. Stuart Krizman

Stuart Krizman, the general manager for Builders, was in charge of coordinating subcontractors employed by Builders. Krizman told Reilly that Gerstein directed him to (1) enter into Builders' "job book" false contracts for substantial amounts of money, (2) issue checks payable to non-existent sub-contractors and return these checks for endorsement by either Davis or Gerstein, and (3) use false job numbers and tax identification numbers in forms submitted to the IRS.

### 3. Jenny Slink

Gerstein told Reilly that Jenny Slink's primary contribution to the fraud scheme was to create fictitious entries in the Builders' computer records so that there would be no suspicious discrepancies between monthly computer printouts and various other forms of documentation required for submission to the Bank at regular intervals. Slink received a one-time bonus of $2,000 in recognition of her participation in the fraudulent scheme.

### 4. Geri Andrewzuski

Gerstein told Reilly that Geri Andrewzuski, an office manager, also helped to create some of the bogus paperwork submitted to the Bank and assisted in the maintenance of a record-keeping system to keep track of legitimate versus non-legitimate contracts. Additionally, Gerstein told Reilly that at his direction, Andrewzuski notarized fraudulent contracts and reports submitted to the Bank.

---

**5.** The light-box referred to herein is "a box-like piece of equipment containing a light and usually having translucent glass on one side which provides an evenly lighted surface." *Oxford English Dictionary* 928 (2d ed.1989).

**6.** Davis was also of great assistance to the defendant in his money-laundering scheme, which complemented the bank fraud by disguising the fact that Gerstein used funds obtained under the lines of credit to make receivables payments to the Bank. We omit a detailed account of the facts supporting Gerstein's money-laundering conviction, for while employees Davis and Krizman clearly participated in this scheme (in addition to the bank fraud), the record does not establish that Slink, Andrewzuski, or Kluzendoff had anything to do with Gerstein's money-laundering activity. Their participation in criminal activity organized or led by the defendant—although substantial—appears to have been limited to the bank fraud itself (i.e., the creation of fraudulent contracts and reports for submission to the Bank).

Like Slink, she received a one-time bonus of $2,000 for her efforts.

#### 5. *Nan Kluzendoff*

Agent Reilly testified that through his interviews with Gerstein and Davis, he discovered that the defendant's secretary, Nan Kluzendoff, was "also involved in this process that created all these fraudulent documents" (i.e., the fake contracts and sham reports submitted to the Bank). Kluzendoff, like Davis, used a light box to forge signatures on bogus contracts, and helped to maintain the aforementioned record-keeping system for distinguishing legitimate finance contracts from the ever-increasing number of phony contracts. As with Slink and Andrewzuski, Kluzendoff also received a one-time bonus of $2,000 for her efforts.

Agent Reilly's testimony served to clarify the respective roles of the various employees in Gerstein's fraudulent scheme. Additionally, Reilly's written summary of his second interview with Gerstein describes some of the activity designed to "cover-up" the scheme. Gerstein told Reilly that late in 1990 he directed Kluzendoff to retrieve some fraudulent contracts from the Bank's vault "so as to get rid of evidence." Kluzendoff complied with this directive, and Gerstein, along with Kluzendoff, Andrewzuski, and Slink, destroyed these documents with a shredding machine. Gerstein also suggested that Andrewzuski (and perhaps Kluzendoff and Slink as well) may have committed perjury before the grand jury by denying their involvement in any fraudulent activity.[7]

## II. ISSUE

The sole question presented on appeal is whether the district court committed clear error when it determined that the defendant was an organizer or leader of criminal activity involving five or more participants and thus enhanced Gerstein's sentence by four levels, pursuant to § 3B1.1(a) of the Guidelines.[8]

## III. DISCUSSION

The Sentencing Guidelines direct the sentencing judge to increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity *that involved five or more participants* or was otherwise extensive." U.S.S.G. § 3B1.1(a) (emphasis added).[9] Gerstein does not dispute that he was an "organizer or leader" of criminal activity, but he does take issue with the sentencing court's determination that five or more "participants" were involved in his scheme to defraud the Bank. Gerstein argues that there were just three participants (himself, Davis, and Krizman) and thus the enhancement under § 3B1.1(a) was improper.

■ Before considering in detail the question of how many individuals took part in Gerstein's fraudulent scheme, we address a preliminary evidentiary issue raised by the appellant. Gerstein, without any discussion or explanation, asserts for the first time in his appellate brief that "there is no *admissible* evidence that [Slink, Andrewzuski, or

7. Agent Reilly's written summary of his February 25, 1994 interview with Gerstein contains the following:

Gerstein is aware that Andrewzuski, Kluzendoff and Slink all met together at a restaurant when they became aware of the grand jury investigation. Andrewzuski, before she testified before the grand jury, told Gerstein that she didn't want to do anything to hurt him and indicated to Gerstein that she was going to deny involvement in fraudulent contracts. After she testified, Andrewzuski told Gerstein that she protected him and that she didn't put any emphasis on Gerstein. Gerstein stated that he asked her what questions were asked of her and that she replied but that he does not recall exactly what those questions were, at the current time.

8. Gerstein, before entering a plea of guilty to the crime charged, reserved the right to contest the propriety of an enhancement under § 3B1.1(a) and later objected to the imposition of the enhancement at his sentencing hearing.

9. In the case before us, the "otherwise extensive" language in § 3B1.1(a) was not relied upon by the sentencing judge, nor has it been advanced by the Government as a basis for enhancing Gerstein's sentence. Accordingly, we decline to enter into a discussion of this language or how it might apply to Gerstein's case. For a discussion of the meaning of the "otherwise extensive" language, see *United States v. Tai,* 41 F.3d 1170, 1173–75 (7th Cir.1994).

Kluzendoff] had any knowledge of criminal activity that would make them 'participants.'" We disagree. The evidence introduced at the sentencing hearing consisted of Agent Reilly's detailed testimony as well as his written summaries of the extensive interviews he conducted with Gerstein, Davis, and Krizman. As discussed below, both Agent Reilly's oral testimony and his written interview summaries establish that Slink, Andrewzuski, and Kluzendoff knowingly participated in Gerstein's fraudulent scheme. Gerstein failed to make a timely, proper objection to the introduction of this evidence during the sentencing hearing; he has thus waived the issue of its admissibility, and we review waived issues only for plain error. Fed.R.Crim.P. 52(b); *United States v. Walker,* 9 F.3d 1245, 1249 (7th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1863, 128 L.Ed.2d 485 (1994). A "plain error," as the Supreme Court has explained, is one that is "particularly egregious," *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1591, 71 L.Ed.2d 816 (1982) and "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993). In our opinion, there was no error, plain or otherwise, in the sentencing court's decision to admit the testimony of Special Agent Reilly, along with the written summaries of Reilly's interviews with Gerstein, Davis, and Krizman.

■ The law is very clear that a sentencing judge "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Taylor,* 72 F.3d 533, 543 (7th Cir.1995); *see also* 18 U.S.C. § 3661. A corollary to this general principle is the rule that a sentencing judge "may consider relevant information *without regard to the rules of evidence* ... provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3

(emphasis added). As this court has explained:

> The sentencing stage of a trial is one of the most important parts of the criminal process. In order for a judge to be well advised of the facts surrounding the defendant's background, and particularly in view of the judge's obligation to the general public, as well as to the defendant, to be fair, reasonable, and just, it is imperative that he be allowed to draw upon a wealth of information concerning the defendant's background, from his date of birth up to and including the moment of sentencing.... In order to render justice to all the judge must be able to impress upon a defendant through the expansive contents of an all encompassing sentencing report that we are a country of laws and not men.

*United States v. Madison,* 689 F.2d 1300, 1314 (7th Cir.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983); *see also United States v. Coonce,* 961 F.2d 1268, 1275 (7th Cir.1992).

■ The appellant fails to explain *how* Agent Reilly's testimony was inadmissible under the more liberal evidentiary standards which apply at the sentencing stage of criminal proceedings. We realize that some, but by no means all, of Reilly's testimony could be deemed hearsay and thus inadmissible at a trial to determine guilt or innocence.[10] However, as we have held many times, reliable hearsay evidence may be considered in sentencing. *See United States v. Garcia,* 66 F.3d 851, 858 (7th Cir.1995) (and citations therein). Whether hearsay evidence is reliable, and thus admissible, is a determination left to the discretion of the sentencing judge. *Id.* We are not persuaded that the sentencing judge in this case abused his discretion by admitting the testimony of a law enforcement agent such as Agent Reilly, especially as the court provided Gerstein and his counsel ample opportunity to test the reliability of

---

10. For example, some of the out-of-court statements of Davis to Reilly may be hearsay. However, Reilly's testimony also contained many statements that would clearly be admissible because they are not defined as hearsay under the Federal Rules of Evidence. Much of what Gerstein told Reilly would constitute an admission by a party opponent and thus be admissible under Fed.R.Evid. 801(d)(2).

the testimony through cross-examination.[11]

Finally, it is important to note that Agent Reilly's testimony was not only admissible, but it was also found to be credible by the sentencing judge, who specifically referred to this testimony when setting forth his factual findings at the conclusion of the sentencing hearing. Appellate judges are—and should be—reluctant to interfere with a trial judge's assessment of witness credibility, for the trial judge, in his role as fact-finder, has:

> the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subjects' reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record.

*United States v. Eddy,* 8 F.3d 577, 582–83 (7th Cir.1993), *cert. denied,* 511 U.S. 1077, 114 S.Ct. 1663, 128 L.Ed.2d 379 (1994).

■ Having established that the testimony of Agent Reilly was both admissible and credible, we turn to the question of whether that testimony sufficiently demonstrates that there were five or more "participants" in the scheme to defraud the Bank, keeping in mind that we review the sentencing court's factual conclusions under the highly deferential "clear error" standard. *United States v. Granado,* 72 F.3d 1287, 1290 (7th Cir.1995).

A "participant" is defined in the Guidelines commentary accompanying § 3B1.1 as "a person who is criminally responsible for the commission of the offense," but the commentary states very clearly that an individual "need not have been convicted" of criminal activity in order to be considered a "participant." U.S.S.G. § 3B1.1, comment. (n.1); *see also United States v. Nelson,* 5 F.3d 254, 258 (7th Cir.1993), *cert. denied,* 510 U.S. 1098, 114 S.Ct. 937, 127 L.Ed.2d 228 (1994). Furthermore, the defendant himself is counted as a "participant" for purposes of determining whether the criminal activity encompassed five or more participants. *United*

States *v. Schweihs,* 971 F.2d 1302, 1318 (7th Cir.1992).

After hearing and considering the testimony of Agent Reilly (relating his interviews with Gerstein, Davis, and Krizman), the sentencing court concluded that Gerstein was an organizer or leader of criminal activity involving five or more participants and applied the sentence enhancement mandated by § 3B1.1(a). Addressing the roles played by Davis, Krizman, Slink, Andrewzuski, and Kluzendoff, the judge observed:

> I suspect that, if these people could have been chargeable as coconspirators in bank fraud, then, certainly, that would be sufficient [for an enhancement under § 3B1.1(a) ]. It seems to me the evidence from [Gerstein's] own statement to the FBI together with the statements of Mr. Krizman and Ms. Davis indicate that these people would all have been potentially chargeable for conspiracy.... Their charge was—and they, apparently, were paid in cash to do this and given bonuses in cash to do this—was to prepare phony documents. I mean, it doesn't take a genius to know that you are participating in bank fraud.... *So, it seems to me, clearly,* that these four women [Davis, Slink, Andrewzuski, and Kluzendoff] and Mr. Krizman, who prepared inaccurate 1099s in support of these phony jobs which were part and parcel of the bank fraud against the bank, *that you have six people, at least, involved.*

Under the clear error standard, we will reverse the sentencing judge's factual determination that six individuals participated in Gerstein's bank fraud scheme only "if, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been committed." *Granado,* 72 F.3d at 1290 (quotation omitted).

Gerstein concedes that he, Davis, and Krizman participated in his bank fraud scheme; we therefore need not address their respective roles. Gerstein does, however, dispute the sentencing judge's finding that Slink, Andrewzuski, and Kluzendoff were participants,

---

**11.** The cross-examination of Reilly was very brief and did nothing to call into question the reliability of the testimony.

arguing that the testimony of Special Agent Reilly (introduced at his sentencing hearing) fell short of establishing that these employees knowingly participated in his fraudulent scheme. According to Gerstein, the sentencing court committed clear error when it found that these three individuals participated in the bank fraud. Indeed, the appellant claims that the sentencing judge based his finding on a mere "suspicion" that Slink, Andrewzuski, and Kluzendoff participated in criminal activity. Gerstein states that evidence to support that "suspicion" is "nonexistent." Our review of Agent Reilly's detailed testimony and the written summaries of his interviews with Gerstein, Davis, and Krizman does not leave us with a "definite and firm conviction" that the sentencing judge was mistaken concerning the roles played by Slink, Andrewzuski, and Kluzendoff.

Our case law establishes that in order to be considered a "participant" for purposes of § 3B1.1, an individual must have *knowingly* taken part in criminal activity. *United States v. Michalek*, 54 F.3d 325, 333 (7th Cir.1995). As discussed in the background section of this opinion in more detail, Agent Reilly's testimony (and the written summaries of his interviews) clearly establishes that employees Slink, Andrewzuski, and Kluzendoff were aware of Gerstein's scheme to defraud the Bank and *knowingly* participated in that scheme under the defendant's direction and control. The evidence demonstrates that in various ways these three individuals were all actively involved in generating false contracts and reports to be submitted to the Bank and helped to maintain a special record-keeping system that made the entire fraudulent scheme possible. Moreover, Gerstein admitted to Agent Reilly that Slink, Andrewzuski, and Kluzendoff were each rewarded with a one-time cash bonus of $2,000 *"because of the extra hours and the extra work that [they] did in order to get all these fraudulent document[s] ready to be submitted to the bank."* In light of the fact that these employees took part in activities obviously designed to deceive the Bank, and considering that they were financially rewarded for such conduct, there

can be no doubt that Slink, Andrewzuski, and Kluzendoff knowingly and willfully participated in this unlawful activity. As Gerstein told Reilly, these employees "were aware of what they were doing." Indeed, in the written summary of Reilly's interview with Gerstein, we read that:

> Gerstein advised that he talked with the four aforementioned office workers [Davis, Slink, Andrewzuski, and Kluzendoff] about the doctored contracts he was submitting to [the Bank]. *Gerstein advised that they were all aware that he had to do this to qualify for a loan and realized that they would not have a job if he was not successful in getting additional financing for his companies.*

In light of the substantial evidence that Slink, Andrewzuski, and Kluzendoff (as well as the defendant, Davis, and Krizman) *knowingly* participated in Gerstein's scheme, there is no reason for this court to set aside as clearly erroneous the sentencing court's application of the § 3B1.1 enhancement. As the Supreme Court has stated, the clear error standard is "significantly deferential," *Concrete Pipe & Prods., Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 623, 113 S.Ct. 2264, 2280, 124 L.Ed.2d 539 (1993), and an appellate court may only reverse a factual finding under this standard when it is left with a "definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). We are not left with a "definite and firm conviction" that the sentencing judge was mistaken when he found that a total of six individuals—including Slink, Andrewzuski, and Kluzendoff—participated in Gerstein's scheme to defraud the Bank. Accordingly, the § 3B1.1(a) sentencing enhancement was proper.

Gerstein argues that the district court's findings are inconsistent with this circuit's recent decision in *United States v. Austin*, 54 F.3d 394, 404–05 (7th Cir.1995), which is, incidentally, the *only* precedent discussed at any length in the appellant's brief. We are of the opinion that Gerstein's reliance on *Austin* is misplaced, for the facts in *Austin* were markedly different from those in the case before us. The defendant in *Austin*

owned and operated a chain of art galleries and was convicted of mail and wire fraud in connection with the sale of counterfeit art works (lithographic prints). The sentencing court applied a § 3B1.1(a) enhancement after determining that five of Austin's employees had knowingly participated in the fraudulent art sales. On appeal, this court agreed with *Austin* that the district court's finding was unwarranted.[12] Although there was evidence that some of Austin's employees had *suspicions* about the authenticity of some of the lithograph prints being sold by the defendant, we noted that none of these employees had been prosecuted and that three of them were specifically "assured by Austin that the works were genuine." *Id.* at 405. Unlike the case before us, in which at least four of Gerstein's employees actually participated in the creation of false documents *themselves* and thus had *first-hand knowledge* that they were involved in criminal activity, there was no evidence in *Austin* that the employees created fraudulent artwork (or even that they could distinguish a real from a phony lithograph, as Austin himself clearly could because of his expertise in the art field). The obviously fraudulent nature of the activities performed by Gerstein's employees—to say nothing of the sizable cash bonuses given to Slink, Andrewzuski, and Kluzendoff—makes it impossible, in our view, to argue that these individuals were merely "suspicious" of criminal activity, as was the case in *Austin*. Rather, the evidence in the record establishes that Gerstein's employees *knew* what was going on and actively participated—as Gerstein explained to Reilly—because they "realized that they would not have a job if he was not successful...." As the sentencing judge aptly observed, "it doesn't take a genius to know that you are participating in bank fraud," particularly when you are engaged in (and are financially rewarded for) such illicit activities as maintaining bogus computer records (Slink), falsely notarizing documents (Andrewzuski), or using a lightbox to forge signatures (Kluzendoff). Fur-

thermore, there is no evidence in the record that any of Gerstein's employees received assurances from their employer concerning the legality of what they were doing (as in *Austin*). Indeed, for Gerstein to have given such assurances under the circumstances would have been laughable (one can hardly imagine the defendant leaning over Kluzendoff's shoulder as she was forging signatures and saying "Don't worry, this is perfectly legitimate"). For all of these reasons, we conclude that the legal authority upon which Gerstein primarily relies, *Austin*, is distinguishable from the case before us and does not mandate reversal of the district court.

## IV. CONCLUSION

Applying the deferential clear error standard of review, we hold that Agent Reilly's admissible, reliable, and credible testimony provided ample support for the district court's finding that Slink, Andrewzuski, and Kluzendoff were "participants" in Gerstein's fraudulent scheme. When these individuals are added to the list of those whom the defendant *admits* were participants (i.e., himself, Davis, and Krizman), the total number of participants is *six*; one more than necessary for the § 3B1.1(a) enhancement to apply. Thus, the enhancement was proper and Eugene Gerstein's sentence is

AFFIRMED.

---

12. In *Austin*, we vacated the district court's § 3B1.1(a) determination, but remanded the case for re-sentencing, leaving open the possibility that although Austin was not a leader/ organizer of criminal activity involving "five or more participants," he may nevertheless have been the leader/organizer of criminal activity that was "otherwise extensive." *Id.;* U.S.S.G. § 3B1.1(a). *See supra* note 9.